477 P.2d 550

ZELLERBACH PAPER COMPANY, a California corp., and Sinclair & Valentine Co., a Division of Martin-Marietta Corporation, a Maryland corp., Appellants,

v.

The VALLEY NATIONAL BANK of Arizona, a national banking association, Appellee.

No. 1 CA–CIV 1136.

Court of Appeals of Arizona, Division 1, Department A.

Dec. 3, 1970.

Rehearing Denied Dec. 30, 1970.

Review Denied Feb. 9, 1971.

Lewis & Roca, by John P. Frank and Peter D. Baird, Phoenix, for appellants.

Rawlins, Ellis, Burrus & Kiewit, by Chester J. Peterson and Michael S. Milroy, Phoenix, for appellee.

DONOFRIO, Presiding Judge.

This is an appeal by Zellerbach Paper Company and Sinclair & Valentine Company seeking to reverse a judgment entered against them in favor of the appellee Valley National Bank, which judgment upheld the validity of certain mortgages executed by West-Coast Printing, Inc. on its corporate property as against appellants' judgment liens. West-Coast was a corporation owned and run by Leopold Ackerman III. Hereafter we shall refer to the Valley National Bank as the bank, and to West-Coast Printing, Inc. as West-Coast. Leopold Ackerman III will be referred to as Ackerman. Sinclair & Valentine Company will be referred to as Sinclair.

At the outset we shall very briefly set forth certain pertinent facts. Later, when necessary, supplemental facts will be added.

On December 11, 1964, the bank loaned $17,000 to West-Coast which was evidenced by an installment promissory note. On June 16, 1965, the bank loaned $47,500 to Ackerman personally, also evidenced by a note due September 14, 1965. On September 7, 1965, two documents were executed. One was an agreement between the bank, Ackerman and West-Coast called "Revision Agreement". Under this agreement Ackerman was to receive a two-month extension on his $47,500 personal note; West-Coast was to receive a two-month extension on $11,000 it still owed to the bank; and West-Coast was to give the bank mortgages on six parcels of corporate property which were to secure both Ackerman's and West-Coast's debts to the bank. Five parcels of realty were located in four different counties of this state and the other parcel was in Nevada. The mortgages were executed and recorded. The second document was called a "Continuing Guaranty". In this document West-Coast promised to guaranty the bank's extension of credit to Ackerman.

Appellant Zellerbach had been selling printing paper to West-Coast on credit during 1964 and 1965, and obtained a judgment against West-Coast in January 1966 for $27,548.39. Sinclair & Valentine Company obtained a judgment against West-Coast on January 28, 1966, for $3,393. These judgments form the basis for the judgment liens.

Both Ackerman and West-Coast failed to make payments on the loans to the bank. The bank then brought this action to foreclose all the mortgages except one which was on the property in Nevada, joining Zellerbach and Sinclair because of their judgment liens on the properties. It is to be noted that the bank obtained a foreclosure judgment on the Nevada property, which is of no concern to the issues herein. On September 23, 1968, default judgment was entered against Ackerman along with other defaulting parties under Rule 54(b), Rules of Civil Procedure, 16 A.R.S. In the foreclosure suit Zellerbach filed a counterclaim and both it and Sinclair asserted affirmative defenses to the bank's complaint. On February 17, 1969, the judgment

with findings and conclusions was entered and filed against the remaining defendants, Zellerbach and Sinclair. Some corrections were made by a judgment filed on March 20, 1969. It is from these instruments that this appeal filed April 18, 1969, was taken.

Appellee bank first raises the question that the appeal was not timely filed because more than sixty days had elapsed from the entry of the default foreclosure suit judgment against Ackerman. The bank contends appellants Zellerbach and Sinclair had to appeal from that judgment which was entered under Rule 54(b), otherwise it became res adjudicata and binding upon them. We cannot agree.

■ The September 23, 1968 judgment against defaulting defendants was against all of the defendants except Zellerbach and Sinclair. It contained the following language: "It Is Further Ordered, Adjudged and Decreed that the Court expressly retains jurisdiction over this matter to determine the rights, if any, of the Defendants, Zellerbach Paper Company and Sinclair & Valentine Co." Since Zellerbach and Sinclair appeared, contested, and did not default in the action, the judgment dating from February 17, 1969, (corrected March 20, 1969) was the only judgment in which they were expressly made parties and from which the time to appeal began to run. It is to be noted that when Zellerbach objected to the form of the default judgment the bank in its response thereto contended that inasmuch as the judgment was entered against only the parties in default, which did not include Zellerbach, that Zellerbach had no right or standing before the court. The trial court entering judgment under Rule 54(b) in the manner it did and ruling favorably on this contention of the bank, leaves no doubt of the court's position that it was not in any way foreclosing any of the rights of the appellants by the default judgment of September 23, 1968. The appellee cannot now say that this appeal is from the wrong judgment.

- Appellants have urged several grounds for reversal. We believe the question that is determinative of this appeal is the one involving the Fraudulent Conveyance Act.

On the fraudulent conveyance issue the trial court made findings that the appellants failed to show insolvency of West-Coast on September 7, 1965, and that a "valuable consideration" was given to West-Coast for the conveyances on September 7, 1965. We may not set aside the trial court's findings unless they are shown to be clearly erroneous. We are not, however, bound by the trial court's conclusions of law and may draw our own legal conclusions from the undisputed facts. 16 A.R.S., Rules of Civil Procedure, Rule 52(a); Sanders v. Brown, 73 Ariz. 116, 238 P.2d 941 (1951). If a finding of fact by the court is clearly erroneous, it is the duty of the reviewing court to set it aside. Brand v. Elledge, 101 Ariz. 352, 419 P.2d 531 (1966).

A.R.S. § 44–1004 provides that every conveyance made and every obligation incurred by a person who is or will thereby be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration.

■ Three basic elements must be shown, namely, a conveyance, a present or ensuing insolvency, and the absence of fair consideration. If, as contended by appellants, the uncontradicted evidence clearly shows these elements, then the conveyance must be set aside or annulled to the extent necessary to satisfy their judgment liens.

As to the first element, conveyances are defined in A.R.S. § 44–1001(2) and mortgages are specifically provided for therein, therefore the mortgages herein are properly considered conveyances.

■ The second question as to whether West-Coast was rendered insolvent as a result of the continuing guaranty and the mortgages is more difficult. The statutory test for insolvency is found in A.R.S. § 44–1002, subsec. A. This statute provides that a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as

they become absolute and matured. The effect of the conveyances (mortgages) was to transfer (mortgage) the corporation's realty to the bank to stand good for Ackerman's personal debt. We believe the evidence, hereinafter discussed, cannot be interpreted in any way other than that West-Coast was rendered insolvent by virtue of the continuing guaranty and the accompanying mortgages.

The trial of this cause consisted of one afternoon and one morning session in court. Only two witnesses testified, Mr. Ackerman and Mr. Vogel, the latter being the accountant for West-Coast. In addition, there was the pretrial statement, along with stipulations and the various exhibits. From our reading of this record there appears to be no conflict of any significance in the evidence. We believe the evidence is uncontradicted that West-Coast was going out of business as a result of financial difficulties; that during this period it ceased normal operation, liquidated fixed printing assets, reduced receivables, and made only $9,000 in sales during the second half of 1965, as opposed to $121,000 for the first half of 1965. It appears from the record that at the end of 1965 West-Coast was down to "zero inventory" and had a deficit of over $40,000.

It is sound to say that on September 7, 1965, West-Coast's liabilities increased $47,-500 because it guaranteed Ackerman's personal debts in that amount. While the liabilities increased by $47,500, the assets decreased by at least $35,000.

The decrease was shown by the following evidence. Ackerman was asked about the value of the Nevada property as of September 1965. This was relevant to proceedings under the Fraudulent Conveyance Act. There was evidence of an appraisal ($50,000) made some time before. There was also the value ($61,000) at which the property was carried on the books of the corporation, but the only evidence of the value at the crucial time involved is that of Ackerman who was the sole shareholder of the corporation. He stated he had felt the property was worth $50,000 and had tried to sell it with at least three brokers and was told it would not bring half that price. He then answered a question to which we can give no other interpretation than that he appraised the property to have a value not "in excess of $25,000".

Bearing this in mind, we find that one of the pieces of realty, located in Las Vegas, was carried on the books at $61,000. The uncontradicted evidence was that as of September 7, 1965, this property was worth less than $25,000. Thus, the assets on that date dropped over $35,000 in value. The Las Vegas property, together with the five other properties in Arizona, were mortgaged, thus depleting West-Coast's assets even more. In this instance, where the assets are reduced $35,000 or more, the liabilities are raised $47,500, together with the fact that the corporation would be unable to retire $112,473.40 current liabilities which are reflected in the June financial statement, insolvency within the meaning of the act is clear. Added to the foregoing is the fact that the corporation was ceasing normal operations between June and December 31, 1965, and that it had months previously lost its main account. Together, these circumstances firmly establish the fact of insolvency.

The bank relies strongly on the fact that the accountant could not, from the instruments before him, arrive at an audited statement of the net worth of the corporation as of September 7, 1965, and that therefore West-Coast must be presumed to have been solvent on September 7. We believe that in this case a $40,000 deficit at the end of 1965 is indicative of West-Coast's financial condition on September 7. 1 G. Glenn, Fraudulent Conveyances and Preferences § 229(b) at 400 (rev. ed. 1940), states:

"* * * as insolvency is not reached overnight,—at least in normal times,—it is a fair conclusion that if the evidence shows a man to be insolvent to-day, he was probably in the same plight yesterday.

"And so we have a rule that evidence of insolvency on a given day is also compe-

tent to prove that the same condition existed at a previous date which is reasonably near. * * *"

This rule is embodied in Fidelity Trust Co. v. Union Nat. Bank of Pittsburgh, 313 Pa. 467, 169 A. 209, 215 (1933), cert. denied 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1933).

Having been in debt on September 7, 1965, under the circumstances shown, and obviously unable to retire its liabilities which, as reflected in the June statement, amounted to $112,473.40, the corporation can be presumed to have been insolvent when it undertook to guarantee and secure Ackerman's debts. Confronted with the same issue in Feist v. Druckerman, 70 F.2d 333 (2d Cir. 1934), the court there stated:

" * * * [A] *voluntary* (emphasis theirs) conveyance made when the grantor is indebted is presumptively fraudulent. We think this means that, if one indebted makes such a transfer, it is *presumed,* (emphasis ours) in the absence of some proof to the contrary, that he was then insolvent. * * *" 70 F.2d at 334

See also First National Bank of Marietta v. Hoffines, 429 Pa. 109, 239 A.2d 458 (1968). To the same effect:

" * * * [W]here one makes a voluntary conveyance while indebtedness is outstanding, the presumption arises, in the absence of proof to the contrary, that the debtor was insolvent at the time. * * *" 37 C.J.S. Fraudulent Conveyances § 106 at 947 (1943).

A prima facie case based on these facts and figures was presented and the bank then had the burden of overcoming this by other evidence. The bank having produced no other evidence, it is our opinion that the trial court was clearly in error in its finding that appellants failed to show insolvency of West-Coast on September 7, 1965.

The final question is whether West-Coast received fair consideration in return for the agreement and mortgages involved. Although the trial court in its findings uses the words "valuable consideration", the words were intended to cover the element of fair consideration required by the statute.

A.R.S. § 44–1003 provides that:

"Fair consideration is given for property, or obligation:

"1. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

"2. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

Here again we are concerned with whether under the evidence the trial court was clearly in error in making its finding and conclusion on this issue.

We first discuss the question as to whether the extension of time on West-Coast's promissory note is a fair equivalent. There was no showing in the evidence that the extension of time had any measurable value to West-Coast. We believe that a two-month extension on an $11,000 balance due on a promissory note to a corporation which is unable to pay its existing creditors under the facts presented, without more, is not a fair equivalent of the property involved. Certainly it would not be a fair equivalent of, let us say, the figure of $25,000 or $47,500.

There was no "present advance". The corporation's only "antecedent debt" to the bank was the $11,000. The $47,500 personal debt of Ackerman is not to be considered in deciding whether West-Coast received fair consideration. The $47,500 Ackerman debt is neither a "present advance" nor an "antecedent debt" of West-Coast. The real question is whether there was in the first place "fair consideration" to support West-Coast's "obligation" or guaranty of Ackerman's personal debts. Hence, the fair consideration point should be decided before any decision can be made about the validity of the guaranty or before

**436**

the $47,500 can be counted as a corporate obligation or debt of West-Coast.

[4–7] As stated in Neal v. Clark, 75 Ariz. 91, 251 P.2d 903 (1952), an answer to what is a fair consideration is not found solely by a determination of the thing sold and the price received in precise scales, but all circumstances considered there should be a reasonable and fair proportion between the one and the other. As brought out therein, inadequacy of price does not mean an honest difference of opinion as to price, but a consideration so far short of the real value of the property as to startle a correct mind or shock the moral sense. Considered, as it must be, from the standpoint of the creditors, Osawa v. Onishi, 33 Wash. 2d 546, 206 P.2d 498 (1949), the extension of time had only conjectural value and falls within the latter category.

The remaining question is whether, as compared with the value of the property (conveyances, etc.) obtained from West-Coast, the antecedent debt ($11,000) was disproportionately small. A.R.S. § 44–1003 (2).

Given the circumstances of this case, particularly where the bank was undertaking to obtain an obligation from West-Coast of $47,500, we believe that as a matter of law the $11,000 antecedent debt of the corporation was disproportionately small as compared with the value of the property ($25,000), or obligation obtained. The $11,000 antecedent debt is $14,000, or 56% less than the value of the real property received by the bank. Thus, the debt is disproportionately small and is without fair consideration. Busick v. Mandeville, 80 Cal.App.2d 853, 183 P.2d 362 (1947); Bailey v. Leeper, 142 Cal.App.2d 460, 298 P. 2d 684 (1956); Osawa v. Onishi, supra.

Nothing herein is to be construed as affecting the validity or priority of the mortgages to the extent necessary to secure West-Coast's $11,000 debt to the bank.

Reversed for further proceedings not inconsistent with this opinion.

STEVENS and CAMERON, JJ., concur.