10 P.3d 1221

**SAL LEASING, INC., an Arizona corporation; Boris Baich, an unmarried man; James Markakis and Michelle Markakis, his wife; Jeffrey Boas, Plaintiffs–Counterdefendants–Appellees,**

v.

**STATE of Arizona, ex rel. Janet NAPOLITANO, Attorney General, and Richard Houseworth, Superintendent of Banks, Defendants-Counterclaimants-Appellants.**

No. 1 CA–CV 99–0631.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 3, 2000.

Review Denied Feb. 13, 2001.

Law Offices of Ronald W. Meyer, by Ronald W. Meyer, Phoenix, for Plaintiffs–Counterdefendants–Appellees.

Janet A. Napolitano, Attorney General, by Hugh E. Hegyi, Assistant Attorney General, Phoenix, for Defendants–Counterclaimants–Appellants.

## OPINION

GARBARINO, Judge.

¶ 1 The State of Arizona appeals from a declaratory judgment holding that the Consumer Lenders Act, Arizona Revised Statutes Annotated (A.R.S.) section 6–601 to –638 (1999), does not apply to SAL Leasing, Inc., an Arizona corporation which operated a business that purchased customers' vehicles at a reduced price and leased them back to the customers with an option to repurchase. In addition, the State appeals the trial court's dismissal of its counterclaim and denial of its request for injunctive relief. We have jurisdiction pursuant to A.R.S. sections 12–2101(B) and (F)(2) (1994), and we affirm in part, reverse in part, and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 From 1993 until approximately January 1999, SAL engaged ostensibly in the purchase and lease of motor vehicles. Appellees Boris Baich and James Markakis served as the president and vice-president of SAL at various times, and also served on the board of directors while the company was in business. Appellee Jeffrey Boas managed the company's Tucson office, while Baich operated its Phoenix office. Markakis located investors for the business. None of the appellees were licensed as a consumer lender or pawnbroker.

¶ 3 SAL obtained customers by advertising in daily and weekly newspapers in both Phoenix and Tucson, and in the Yellow Pages

in Phoenix. Until 1998, SAL's *Republic* and *Gazette* advertisements read:

A A A A AARON ACC.

**NEED CASH? GET CASH!**

4 Your car/keep to Drive

**Quick Cash ★ 277–7720**

SAL also obtained customers through referrals.

¶ 4 Although customers came to SAL for many reasons, most needed money immediately because they wanted to avoid eviction and needed to pay utilities and rent. SAL provided the money in the form of a sale and lease-back transaction. This transaction required a customer to transfer his or her vehicle to SAL. SAL would then obtain a new vehicle title in its name. Simultaneously, SAL and the customer would enter into a lease agreement which allowed the customer to lease the vehicle for one year. During the term of the lease, customers were responsible for maintaining liability, collision, and comprehensive insurance on the vehicle and keeping it in good repair. If the customer defaulted on making lease payments, SAL could repossess the vehicle and sell it.

¶ 5 The trial court found that the typical lease payment was $5 to $12 per day. The customer and appellees determined the lease rate with particular regard to the rate charged by other used vehicle leasing businesses such as "Rent–A–Wreck." The trial court further found that "[t]he lease payment had no correlation or relationship to an interest rate."

¶ 6 The trial court did not make any findings concerning the relationship between the lease fees and the sale proceeds. The State submitted evidence, which was undisputed, that appellees' lease fees amounted to 218% of the sale proceeds received by appellees' customers. Moreover, the lease contracts provided for, and appellees sometimes imposed, a fee if a customer's payment was late. The fee was an added charge of $5 per day for the rest of the lease, together with a one-time charge of $25. According to the State, these additional daily late charges brought appellees an annual return of $1825, or 365%

on transactions in which customers received $500.

¶ 7 Appellees repossessed about 18% of the cars they leased following purchase. They were not in the business to accumulate vehicles and did not maintain a rental fleet for third parties to lease. Repossessed vehicles were either redeemed by the original owners or sold at auction. Out of 775 sale and lease-back transactions, only one resulted in proceeds exceeding $10,000.

¶ 8 In 1993, an attorney for another sale and lease-back company wrote a letter to the Arizona Banking Department requesting a refund of fees submitted in order to become licensed under the Motor Vehicle Time Sales Disclosure Act, A.R.S. sections 44–281 to –295 (1987 & Supp.1992). The State Banking Department responded by letter enclosing the fee refund and opining that the inquiring company, Secure Leasing, did not need a motor vehicle dealer license or a sales finance license. The letter also provided that "this activity may, under a slightly different fact scenario be subject to the provisions of the Consumer Loan statute."

¶ 9 In 1995, appellees filed a declaratory judgment action seeking to establish that SAL's transactions did not require a pawnbroker license. The State moved to dismiss the complaint, contending that it knew virtually nothing about SAL and that there was no impending prosecution as required for Arizona's Uniform Declaratory Judgments Act, A.R.S. sections 12–1831 to –1846 (1994). In addition, the State urged dismissal because the pawnbroker statute might be only one of several statutes applicable to SAL. SAL stipulated to a dismissal of the complaint with prejudice.

¶ 10 In late 1996, the State began investigating appellees. The investigation involved repeated contact between the State and appellees. During the summer of 1998, the State proposed a settlement, but the parties were never able to reach an agreement.

¶ 11 On November 18, 1998, appellees filed a complaint against the State seeking a declaratory judgment establishing that the business transactions in which they were engaged did not violate the Consumer Lenders

Act. The State counterclaimed alleging that the transactions were usurious under the Consumer Lenders Act and that appellees had also violated the Arizona Consumer Fraud Act, A.R.S. sections 44–1521 to –1534 (1994), and the Organized Crime and Fraud Act, A.R.S. sections 13–2301 to –2318 (1989 & Supp.1998), in connection with the loans. The State requested injunctive relief to enjoin appellees from violating these statutes. In addition, it requested that all money or property obtained from customers through any practice violating the Consumer Lenders Act and the Arizona Consumer Fraud Act be restored to them, as well as a payment of treble damages to all persons injured by violations of the Organized Crime and Fraud Act. The counterclaim further requested a civil penalty of up to $10,000 for violation of the Arizona Consumer Fraud Act, an order to any relevant person or enterprise to restore and forfeit property illegally obtained, and reimbursement for the costs of investigation, reasonable attorneys' fees, and court costs. The trial court found that appellees had effectively shut down all operations approximately two and one-half months after the counterclaim was filed.

¶ 12 Following a hearing on the State's request for an injunction, the trial court made findings of fact and conclusions of law and entered an order denying the State's request for injunctive relief, dismissing the counterclaim, and granting appellees' request for declaratory relief, attorneys' fees, and costs. This appeal followed.

**DISCUSSION**

I. *Standards of Review*

■ ¶ 13 This Court is bound by the trial court's findings of fact unless they are clearly contrary to the evidence. *See Polk v. Koerner,* 111 Ariz. 493, 494, 533 P.2d 660, 661 (1975). We "examine the record only to determine whether substantial evidence exists to support the trial court's action. Substantial evidence is evidence which would permit a reasonable person to reach the trial court's result." *In re Estate of Pouser,* 193 Ariz. 574, 579, ¶ 13, 975 P.2d 704, 709 (1999) (citations omitted). However, we are not bound by the trial court's conclusions of law, which

are subject to de novo review. We may draw our own legal conclusions from any undisputed facts. *See Zellerbach Paper Co. v. Valley Nat'l Bank,* 13 Ariz.App. 431, 433, 477 P.2d 550, 552 (1970). A statute's constitutionality is also a matter of law. *See Martin v. Reinstein,* 195 Ariz. 293, 301, ¶ 16, 987 P.2d 779, 787 (App.), *review denied* (1999).

II. *Status of Appellees' Sale and Lease-Back Transactions*

¶ 14 The Consumer Lenders Act defines commercial loans and commercial lenders as follows:

5. "Consumer lender" means a person that advertises to make or procure, solicits or holds itself out to make or procure, or makes or procures consumer lender loans to consumers in this state.

. . . .

7. "Consumer loan" means the direct closed end loan of money in an amount of ten thousand dollars or less that is subject to a finance charge. For the purpose of determining whether a consumer loan is ten thousand dollars or less only the principal amount of the loan shall be considered and not any finance charges or other fees allowed pursuant to § 6–635.

A.R.S. § 6–601 (1999).

¶ 15 "Unless exempt under section 6–602 [inapplicable here], a person shall not engage in the business of a consumer lender without first being licensed as a consumer lender by the superintendent." A.R.S. § 6–603(A) (1999). Only licensed consumer lenders may charge up to 36% in finance charges on the first $500 of the loan and up to 24% on any amount of the loan exceeding $500. *See* A.R.S. § 6–632(A)(2)(a) (1999). This statute applies "to any person who seeks to avoid its application by any device, subterfuge or pretense ." A.R.S. § 6–603(B) (1999).

■ ¶ 16 The crux of the dispute is whether appellees' sale and lease-back transactions were actually disguised consumer loans and not sales. The trial court concluded, as a matter of law, that SAL's transactions were not loans within the meaning of the Consumer Lenders Act. We disagree.

¶ 17 The mere fact that a transaction is characterized as a lease with an option to repurchase does not save it from the operation of the usury statute. "Lease-purchase contracts ... are often used as devices to disguise usurious loans." *Moran v. Kenai Towing & Salvage, Inc.,* 523 P.2d 1237, 1243 (Alaska 1974). In *Merryweather v. Pendleton,* the Arizona Supreme Court set forth six factors that should be analyzed to determine if a transaction structured as a sale with an option to repurchase is actually a security device for a loan:

(1) the prior negotiations of the parties;

(2) the distress of the "grantor";

(3) the fact that the amount advanced was about the amount that the grantor needed to pay an existing indebtedness;

(4) the amount of the consideration paid in comparison to the actual value of the property in question;

(5) a contemporaneous agreement to repurchase; and

(6) the subsequent acts of the parties, as a means of discerning the interpretation they themselves gave to the transaction.

91 Ariz. 334, 342, 372 P.2d 335, 340–41 (1962) (footnotes omitted). "No one of these factors is conclusive, but a combination of several will go a long way in showing that an absolute conveyance was actually a security arrangement." *Id.* at 342, 372 P.2d at 341. In case of doubt, courts tend to hold an agreement to be a mortgage in order to protect all parties and prevent forfeiture of the pledged property. *See id.*

¶ 18 *Merryweather* was a suit in equity to have an agreement for the sale and transfer of stock declared to be an equitable mortgage. Applying the six factors, the *Merryweather* court decided that the transaction was a security agreement and not a sale. *See id.* at 342–43, 372 P.2d at 341–42. In analyzing the first of the six factors, the court found that the defendant, Pendleton, had previously loaned $160,000 to the plaintiff, Merryweather, and that Merryweather had repaid said sum. As to the second factor, the court found that Pendleton was aware that Merryweather was in financial distress and faced the possibility that his stock would be garnished. Third, the court

found that the proceeds of the transaction were used to pay the existing debt. As to the fourth factor, the supreme court determined that the consideration paid was disproportionate for a sale. An "advisory jury" found the stock to be worth $630,000, while the trial court pegged its value at $394,000. The fifth factor was satisfied because the agreement contained an option to repurchase, making the proceeds of the transaction disproportionate to the proceeds of the alleged sale. Finally, the supreme court determined that the parties' acts following the transaction indicated that the arrangement was considered to be the equivalent of a mortgage and loan. Pendleton treated Merryweather as though Merryweather still owned the stock. Merryweather also appeared as though he still considered himself to be the owner and he communicated this position to Pendleton. *See id.* The supreme court concluded that all six factors were present and that the transaction was not a sale, but rather a loan secured by the stock.

#### A. *Application of the Merryweather Factors to this Case*

##### 1. *Financial Distress of Customers*

¶ 19 The record establishes that most customers came to appellees because they were in financial distress. Baich testified that his customers were in a "jam." He described them as people who had a financial "emergency" and who "needed cash quickly." He believed SAL helped people who had "no or bad credit ... in an emergency."

¶ 20 Baich's assessment was confirmed by SAL's former customers. Donald W. Griffith needed money to pay for repairs to his car and for funeral expenses, and had no alternative means to obtain it. Peter H. Hackstedde needed money to pay his income tax and had no alternatives. Charles Edwin Tadao Kawakami was disabled and could not work. He was without income for a time until his disability payments started and needed money to bridge the gap. Richard J. Itule had a business problem that required cash and also had no alternatives.

¶ 21 According to Boas, the Tucson office manager, many clients were "somewhat

hardship cases." Some needed money for rent. Most had prior bankruptcies or repossessions, and many came to sell because they were being evicted or their utilities were being shut off.

### 2. Amount of the Sale Price

¶ 22 It is undisputed that the amount that appellees paid their customers was the amount the customers needed to pay existing debts. Baich testified that "more often than not, the individuals come in the office, they have a specific dollar in mind, they need to get themselves out of the jam so we work with that number."

### 3. Value of the Average Sale Price

¶ 23 Appellees did not introduce evidence to controvert the State's assertion that, on average, they paid their customers only a small fraction of their vehicles' value. Appellees paid their customers an average of 18% of the vehicles' retail value, as established by the industry guide they used. Baich testified "we were purchasing the vehicles for no more than 30 percent of low wholesale value" minus deductions, and that "certain individuals needed [a] lot less than ... the actual value of the vehicle." Baich also said that appellees paid an average of 20% of retail blue book value, and 30% of wholesale value.

### 4. Option To Repurchase

¶ 24 Appellees have admitted that the sales of the vehicles were accompanied by a contemporaneous repurchase option.

### 5. The Parties' Negotiations

¶ 25 The parties' negotiations indicated that the vast majority of SAL's customers wanted loans, and that they agreed to enter into a sale/lease-back transaction only because appellees would not make money available through any other form of transaction. Baich agreed that, even though he explained to callers over the phone that he was not offering loans, there were still times when people came to see him and thought they were getting a loan.

¶ 26 Appellees argue that the prior negotiation element is not present here. In *Merry-*

*weather*, the transaction negotiations began as a request for a loan to pay off a debt, but ended in the execution of an agreement in the form of a sale. 91 Ariz. at 337, 372 P.2d at 337–38. Similarly, this case involved customers who needed loans for a specific amount, were told that loans were not available, and ended up executing documents in the form of a sale. Even though appellees and their customers do not appear to have entered into a completed loan transaction prior to entering the transaction at issue, as the parties had in *Merryweather*, their negotiations typically involved a discussion about the possibility of a loan.

### 6. Appellees' Subsequent Acts

¶ 27 Finally, the subsequent course of conduct by appellees also indicates that the transactions were loans in substance although not in form. Baich testified that if SAL's customers did not make their payments or exercise their purchase option at the end of the lease, SAL repossessed and sold the vehicle. However, if customers made the lease payments contemplated by the parties, the customer was allowed to continue in possession.

¶ 28 Without explanation, appellees argue that these facts do not satisfy the subsequent acts requirement. Unlike the *Merryweather* situation, there does not appear to be evidence that the customers specifically made appellees aware that they still considered themselves to be owners of the vehicles. *See Merryweather*, 91 Ariz. at 343, 372 P.2d at 341 ("It is quite clear that Merryweather considered the transaction to be a mortgage and loan at all times, and that he made Pendleton aware of this attitude."). However, several customers testified that they felt they were getting a loan. Admittedly, this is the State's weakest point, but *Merryweather* does not require that all of the factors be conclusively established. *See id.* at 342, 372 P.2d at 341.

### B. Evidence That Transactions Were Usurious

¶ 29 Using the *Merryweather* analysis, we conclude that appellees' transactions were, in reality, loans in which vehicle title transfers

served as security devices, and not bona fide sales. Although appellees argue that the subsequent event and negotiation elements are not established by these facts, there is some evidence of those factors and strong evidence to support the other four factors. The absence of negotiation for a fair sale price and the absence of any intent to realize a property's full value are particularly persuasive. *See Merryweather*, 91 Ariz. at 342–45, 372 P.2d at 340–43; *De Wulf v. Bissell*, 83 Ariz. 68, 71, 316 P.2d 492, 494 (1957) (affirming the trial court's holding that the sale and lease-back of real estate with an option to repurchase constituted a usurious loan); *Kawauchi v. Tabata*, 49 Haw. 160, 413 P.2d 221, 231 (1966) (holding that the absence of negotiations for sale at a fair price and the fact that neither party intended plaintiff to realize the value of the property in the transaction "unmistakably [mark] the transaction as a loan"). Appellees did not dispute the State's evidence. Accordingly, we find as a matter of law that the transactions constituted consumer loans and that the trial court's declaration on this subject was erroneous.

¶ 30 Appellees attempt to distinguish *Merryweather* urging that the decision is based on the public policy of preventing forfeiture. We believe that the *Merryweather* policy applies equally to the transactions at issue here. About 18% of SAL's customers forfeited cars they had owned free of liens before doing business with appellees, and appellees' transactions put their remaining customers at risk of suffering the same fate. Moreover, the public policy underlying the usury provisions is part and parcel of the policy requiring safeguards before allowing mortgage foreclosures. Both are intended to protect vulnerable borrowers from overbearing lenders.

¶ 31 Appellees argue that they are not subject to sanction because their conduct was not willful. Consequently, they argue that such conduct cannot be considered a device, subterfuge, or pretense under the Consumer Lenders Act. The trial court accepted appellees' argument and concluded as a matter of

law that the sale lease-back transaction was not a "device, subterfuge or pretense." We disagree.

¶ 32 Notwithstanding appellees' attempt to ascertain what law, if any, applied to their situation, the fact remains that the business transactions themselves qualified as a device, subterfuge, or practice. In *Seargeant v. Smith*, Roscoe Smith brought an action under the usury statute to recover amounts paid for options to purchase vehicles. 63 Ariz. 466, 467–68, 163 P.2d 680, 680–81 (1945). Pursuant to their arrangement, Smith, a used car dealer, would find a used car for L.H. Seargeant, a licensed money lender, to buy. The car was placed on Smith's lot, and Seargeant would give Smith an option on the car. Under the option, Smith was entitled to purchase the car for the exact sum of the advanced purchase price. As consideration for the option, Smith paid 3.5% per month of the amount Seargeant had paid for the car. Whenever Smith sold one of the cars, he would exercise the option by paying Seargeant the amount mentioned in the option. Smith eventually sued Seargeant, alleging that the sums paid by Smith and received by Seargeant as consideration for the options were interest in excess of 8% per annum, and therefore violated the usury statute. *See id.*

¶ 33 The *Seargeant* court found that there was an implied obligation to return the amount advanced in payment for each vehicle. *Id.* at 470, 163 P.2d at 682. In concluding that the transaction was usurious, the court explained that " 'unlawful intent' is presumed from the mere fact of intentionally doing what is forbidden by statute." *Id.* at 469, 163 P.2d at 681. Likewise, we presume that the State has demonstrated the device, subterfuge, or practice element based upon undisputed facts that appellees engaged in sale and lease-back transactions which actually were loans. The fact that the "lease fees" charged by SAL averaged 218% per annum is further evidence of their unlawful intent and the statute's violation.[1]

1. The trial court found that the lease fees were competitive and were not interest rates. However, the fact that appellees' lease fees were competitive did not foreclose the conclusion that they were interest rates or finance charges.

### III. *Vagueness Challenge*

¶ 34 Appellees further contend that the Consumer Lenders Act is void for vagueness. To succeed on this challenge, appellees must overcome a strong presumption that the law is constitutional. *See Martin*, 195 Ariz. at 301, ¶ 16, 987 P.2d at 787. A statute is unconstitutionally vague when "it does not give persons of ordinary intelligence a reasonable opportunity to learn what it prohibits and does not provide explicit standards for those who will apply it." *State v. Takacs*, 169 Ariz. 392, 394, 819 P.2d 978, 980 (App.1991). "However, due process does not require that a statute be drafted with absolute precision." *Id.* at 395, 819 P.2d at 981. Nor will a statute violate due process merely "because it is susceptible to more than one interpretation." *Id.*

¶ 35 In analyzing a vagueness challenge, courts will look to judicial decisions, to settled common law meanings of the words used, and to the technical meanings of those words. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499–501, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Judicial gloss can supply meaning to a statute that otherwise lacks it. *United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The key is whether the statutes, either standing alone or as construed, made it reasonably clear at the relevant time that a party's conduct was prohibited. *See id.* at 267, 117 S.Ct. 1219.

¶ 36 Applying the void for vagueness principles, we find that the argument lacks merit. Usury case law—including *Merryweather* and *Seargeant*—gave appellees fair warning that their conduct was proscribed and made arbitrary prosecution impossible. Furthermore, the terms "device," "subterfuge," and "pretense" have commonly understood legal meanings and are not vague. *See State v. Phillips,* 178 Ariz. 368, 370–71, 873 P.2d 706, 708–09 (App.1994) (holding that because the terms of a statute prohibiting driving under the influence adequately provided people of ordinary intelligence with an opportunity to know what type of conduct is prohibited, they meet the constitutional standard).

¶ 37 Appellees also argue that the chronology of their dealings with the State reflects that the Consumer Lenders Act is unconstitutionally vague. This argument misconstrues the relevant events. The letter from the State to Secure Leasing did not state that the Consumer Lenders Act was inapplicable; rather, it noted the possibility that the company could have violated the statute "under a slightly different fact scenario." Moreover, the State's motion to dismiss appellees' earlier declaratory judgment action concerning the pawn broker statutes did not foreclose the possibility that appellees were liable under the Consumer Lenders Act.

### IV. *Injunction and Other Relief*

¶ 38 Having determined that the Consumer Lenders Act is not void for vagueness and that appellees are liable for its violation, we need to consider whether substantial evidence supports the trial court's denial of injunctive relief. *See Gillespie Land and Irrigation Co. v. Gonzalez,* 93 Ariz. 152, 167, 379 P.2d 135, 146 (1963). Because we determine that such evidence exists, we affirm the trial court's resolution of this issue.

¶ 39 The issue of injunctive relief is moot when the "events make it absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.,* 128 Ariz. 483, 486, 626 P.2d 1115, 1118 (1981) (quoting *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 82 Wash.2d 265, 510 P.2d 233, 238 (1973)); *see Evenson v. Ortega,* 605 F.Supp. 1115, 1121 (D.Ariz. 1985) (withholding injunctive relief and explaining that there was little evidence that a sheriff who was no longer in office would return to placing ads). Factors that may point to a danger of future violations include past violations, involuntary cessation of the violations, and their continuance in disregard of the lawsuit. *See Babbitt,* 128 Ariz. at 486–87, 626 P.2d at 1118–19.

¶ 40 The trial court found, and the record supports the finding, that SAL shut down all operations in approximately January 1999. Both offices stopped advertising at least by the summer of 1998. The evidence reflects

that business activity had significantly declined by the winter of 1998, when the State filed its counterclaim. In January 1999, only one payment was received. Based upon this evidence, the trial court concluded that appellees were unlikely to reopen for business. We find that the evidence supporting this resolution was substantial and therefore affirm the trial court's denial of injunctive relief.

¶ 41 The trial court's holding that appellees had not made consumer loans obviated the need to address the State's claim for monetary relief and other relief under the Consumer Lenders Act. We reverse that holding, and accordingly direct the trial court to consider on remand what, if any, relief the State may be entitled to obtain.

V. *Consumer Fraud Act and Organized Crime and Fraud Act Claims*

¶ 42 The trial court dismissed the State's other claims for violations of the Arizona Consumer Fraud Act and the Organized Crime and Fraud Act. These claims are related to appellees' violation of the Consumer Lenders Act. For example, appellees' representations regarding the nature of their transactions arguably implicated the Arizona Consumer Fraud Act. *See Burnett v. Ala Moana Pawn Shop,* 3 F.3d 1261, 1262 (9th Cir.1993) (holding that a sale with an option to repurchase constituted deception under Hawaii's Deceptive Trade Practices Act because it disguised loans as sales with repurchase options). Moreover, the State sought remedies for usury and fraudulent schemes under the Organized Crime and Fraud Act. We reverse the dismissal of these claims and remand them for further proceedings.

### CONCLUSION

¶ 43 We reverse the trial court's holding that appellees' sale and lease-back transactions did not violate the Consumer Lenders Act and we vacate the trial court's award of attorneys' fees to appellees. We affirm the trial court's denial of injunctive relief, but remand for a determination of what other relief, if any, is recoverable. In addition, we remand the State's claims for violations of the Arizona Consumer Fraud Act and the Organized Crime and Fraud Act for further proceedings.

CONCURRING: JAMES B. SULT, Presiding Judge, and MICHAEL D. RYAN, Judge.