2003 OK 89

**APLE AUTO CASH EXPRESS, INC. OF OKLAHOMA, an Oklahoma corporation, Petitioner/Appellant,**

v.

**STATE of Oklahoma, ex rel. OKLAHOMA DEPARTMENT OF CONSUMER CREDIT, Respondent/Appellee.**

No. 97,635.

Supreme Court of Oklahoma.

Oct. 21, 2003.

James L. Kincaid, Gary L. Betow, Kayci B. Hughes, Tulsa, OK, for Petitioner/Appellant.

Walter W. Jenny, Jr., Assistant Attorney General, Oklahoma City, OK, for Respondent/Appellee.

KAUGER, J:

¶ 1 The question presented on certiorari is whether a company's purchase of customers' vehicles at a reduced price and the subsequent lease-back to the customers as rent-to-own vehicles falls under the Oklahoma Rental–Purchase Act, 59 O.S.2001 § 1950 et seq.[1] or whether such transactions should be regulated as a supervised consumer loan under 14A O.S.2001 § 1–101 et seq.[2] We hold that these transactions are nothing more than disguised loans, rather than *bona fide* sales or rental agreements, and should be regulated as such.

## FACTS

¶ 2 The Oklahoma Department of Consumer Credit (the Department) administers and enforces the Oklahoma Rental–Purchase Act (Rental Act)[3], the Oklahoma Uniform Consumer Credit Code (the Code)[4], and the Oklahoma Pawnshop Act.[5] In August of 2001, the appellant, Aple Auto Cash Express, Inc. (Aple) incorporated as an Oklahoma corporation. It sought and obtained a rent-to-own license from the Department, but did not seek a license as either a supervised lender or pawnbroker.

¶ 3 After securing the rent-to-own license, Aple opened for business in Tulsa, Oklahoma, and began entering into transactions with customers. It posted a notice on its premises that it did not make loans. However, Aple advertised in the yellow pages under listings for loans and pawnbrokers that it provided "fast cash" for vehicle buy/rental—purchase programs. Aple did not have an inventory of vehicles to rent-to-own to the public. Rather, when a customer came in for "fast cash", Aple purchased the customer's car at a re-

1. Title 59 O.S.2001 § 1950 et seq.

2. Title 14A O.S.2001 § 1–101 et seq.

3. Title 59 O.S.2001 § 1950 et seq.

4. Title 14A O.S.2001 § 1–101 et seq.

5. Title 59 O.S.2001 § 1501 et seq.

duced price [6] and executed a rental-purchase agreement to rent the car back from Aple, with an option to purchase if all of the monthly payments were made. The contract also provided that the customers could terminate the agreement by returning the vehicle to Aple in good condition and paying all rental payments through the date of return.

¶4 In November of 2001, the Department notified Aple that its' license was suspended, pending an investigation and hearing to determine if the license should be permanently revoked. On November 30, 2001, the Department issued notice of a hearing scheduled before the administrator of the Department for December 13, 2001. It also issued an order to show cause and to cease and desist. The notice complained of 176 counts in which the Department alleged violations of either supervised loan laws and finance charge limits or pawnbroker licensing and advertising laws.

¶5 A hearing was held on December 18, 2001, at which most of the facts were stipulated. At the hearing, the examiner for the Department testified that if the transactions were treated as *bona fide* rent-to-own transactions, there was no limit on the charges that could be assessed. The examiner noted that information regarding the proceeds from the sales of some of the vehicles was lacking because some of the documentation was kept at the home office in another state. However, the examiner also testified that some of the transactions, if interpreted to be supervised loans, would equate to interest at annual percentage rates of 285.65%, 290.99%, and 484.33%. For example, the examiner's investigation form shows a sale in which a consumer sold Aple a pick-up truck for $2,500.00 and agreed to lease it back for 156 weeks at $69.00 for a total of $10,764.00. Several similar transactions were also reported.

¶6 On January 3, 2002, the Department's administrator issued findings of fact and conclusions of law. It determined that Aple's rent-to-own operation was disguised as a supervised loan business. Because Aple did not comply with the requirements for being a supervised lender, the administrator ordered the contracts voided and the return of money collected from the customers.

¶7 On January 9, 2002, Aple appealed the administrator's order to the district court pursuant to the Oklahoma Administrative Procedures Act, 75 O.S.2001 § 250 et seq.[7] A hearing was held on February 8, 2002, and on March 26, 2002, the trial court entered a final order affirming the administrator's order. The trial court stayed enforcement of the order until the final disposition of the cause on appeal. The Court of Civil Appeals reversed and we granted certiorari on September 18, 2003.

¶8 We must decide whether the facts determined by the agency are supported by substantial evidence, and the order is otherwise free of error. If so, the decision of the agency must be affirmed.[8] Reversal is appropriate if the reviewing court finds that the agency made its decision in excess of statutory authority or jurisdiction or entered its order based on an error of law.[9] Here, the basic facts were stipulated and are not in dispute. The issue on appeal involves a question of the application of the stipulated facts to the law.

¶9 **THE BUSINESS TRANSACTIONS ARE NOTHING MORE THAN DISGUISED LOANS, RATHER THAN *BONA FIDE* SALES OR RENTAL AGREEMENTS, AND SHOULD BE REGARDED AS SUCH.**

¶10 Aple argues that: 1) 59 O.S.2001

6. Aple argues that there was no evidence before the administrator showing it purchased vehicles below market value. However, the Department's exhibit 2 shows that a pick-up was purchased for $2,500.00 and included in the exhibit is a market analysis for the pick-up showing the average price to be $6,799.00 for the month in which the truck was purchased.

7. Title 75 O.S.2001 § 250 et seq.

8. *Snider v. State ex. rel. Oklahoma Real Estate Com'n,* 1999 OK 55, ¶8, 987 P.2d 1204; *City of Hugo v. State ex rel. Public Employees Relations Bd.,* 1994 OK 134, ¶9, 886 P.2d 485; *Tulsa Area Hospital Council, Inc. v. Oral Roberts University,* 1981 OK 29, ¶10, 626 P.2d 316.

9. *City of Tulsa v. Public Employees Relations Bd.,* 1998 OK 92, ¶12, 967 P.2d 1214.

§ 1951 [10] expressly defines the parameters of rental-purchase transactions; 2) the types of transactions it engages in are in compliance with the plain and unambiguous language of § 1951; and 3) a rental-purchase agreement which complies with § 1951 is not a consumer loan as defined by the Code.[11] The Department contends that: 1) Aple seeks to escape the regulation of consumer loans by merely labeling its transaction a rent-to-own agreement; and 2) there is no statutory authority which would allow Aple to first purchase property from a consumer and lease it back to them to qualify as a *bona fide* rent-to-own agreement.

¶ 11 Oklahoma's Uniform Consumer Credit Code [12] (the Code) was enacted to simplify and clarify consumer credit transactions and to protect consumers against unfair and unscrupulous creditors.[13] Supervised loans are among the types of transactions regulated by the Code. Title 14A O.S.2001 § 3–501 provides:

"(1) 'Supervised loan' means a consumer loan in which the rate of the loan finance charge exceeds ten percent (10%) per year as determined according to the provisions on loan finance charge for consumer loans (Section 3–201).

(2) 'Supervised lender' means a person authorized to make or take assignments of supervised loans."

Title 14A O.S.2001 § 3–104 defines a consumer loan as:

"... a loan made by a person regularly engaged in the business of making loans in which

(1) the debtor is a person other than an organization;

(2) the debt is incurred primarily for a personal, family or household purpose;

(3) either the debt is payable in installments or a loan finance charge is made; and

(4) either the principal does not exceed Forty-five Thousand Dollars ($45,000.00) or the debt is secured by an interest in land."

¶ 12 The Code requires supervised lenders to obtain a license; register a service agent in Oklahoma; post a bond; submit to a criminal history check; and retain records subject to examination to determine compliance with

---

10. Title 59 O.S.2001 § 1951 provides in pertinent part:

"... 'Rental-purchase agreement' means an agreement for the use of personal property by a consumer for personal, family, or household purposes, for an initial period of four (4) months or less, that is renewable with each payment after the initial period, and that permits the consumer to become the owner of the property. An agreement that complies with this definition is not a consumer credit sale as defined in Section 2–104 of Title 14A of the Oklahoma Statutes, or a consumer loan as defined in Section 3–104 of Title 14A of the Oklahoma Statutes, or a refinancing or consolidation thereof, or a consumer lease as defined in Section 2–106 of Title 14A of the Oklahoma Statutes, or a lease or agreement which constitutes a security interest as defined in paragraph (37) of Section 1–201 of Title 12A of the Oklahoma Statutes or a lease or agreement which constitutes a sale of goods as defined in subsection (4) of Section 2–105 of Title 14A of the Oklahoma Statutes...."

11. We note that throughout Aple's paperwork before the Department and the trial court, Aple refers to several bankruptcy cases in which the courts discussed whether the particular agreements which were involved were notes or securi-

ty agreements which created a security interest. However, these cases are factually distinguishable from the present case and are inapplicable here.

12. Title 14A O.S.2001 § 1–101 et seq.

13. Title 14A O.S.2001 § 1–102 provides in pertinent part:

"(1) This act shall be liberally construed and applied to promote its underlying purpose and policies.
(2) The underlying purposes and policies of this act are
(a) to simplify, clarify and modernize the law governing retail installment sales, consumer credit, small loans and usury;
(b) to provide rate ceilings to assure an adequate supply of credit to consumers;
(c) to further consumer understanding of the terms of credit transactions and to foster competition among suppliers of consumer credit so that consumers may obtain credit at reasonable cost;
(d) to protect consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors ..."

the Code.[14] Under the Code, a lender must make lending disclosures to consumers regarding the details of loan transactions [15] and is limited on the amount of loan finance charges it may assess.[16]

¶ 13 The Oklahoma Rental–Purchase Act, 59 O.S.2001 § 1950 et seq [17] (the Rental Act) governs rent-to-own transactions otherwise known as "rental-purchase agreements". The Rental Act requires lessors to obtain a license [18] and make specific disclosures to consumers.[19] It also provides for damages and penalties for violations.[20] Section 1951 of the Rental Act defines rental-purchase agreements, providing in pertinent part:

"... 'Rental-purchase agreement' means an agreement for the use of personal property by a consumer for personal, family, or household purposes, for an initial period of four (4) months or less, that is renewable with each payment after the initial period, and that permits the consumer to become the owner of the property. An agreement that complies with this definition is not a consumer credit sale as defined in Section 2–104 of Title 14A of the Oklahoma Statutes, or a consumer loan as defined in Section 3–104 of Title 14A of the Oklahoma Statutes, or a refinancing or consolidation thereof, or a consumer lease as defined in Section 2–106 of Title 14A of the Oklahoma Statutes, or a lease or agreement which constitutes a security interest as defined in paragraph (37) of Section 1–201 of Title 12A of the Oklahoma Statutes or a lease or agreement which constitutes a sale of goods as defined in subsection (4) of Section 2–105 of Title 14A of the Oklahoma Statutes...."

¶ 14 Under the Rental Act, transactions which meet the definition of rental-purchase agreements are not considered consumer loans. Some states have expressly clarified that statutes regulating rent-to-own transactions were not intended to include sale/lease-back arrangements such as Able's.[21] The Oklahoma Legislature did not expressly refer to sale/lease-back transactions.

¶ 15 Aple devotes much of its argument as to whether 59 O.S.2001 § 1951 [22] is ambiguous and how, if at all, it could be construed. However, the crux of the dispute is not about statutory construction.[23] Rath-

---

14. See, 14A O.S.2001 §§ 3–503–506.

15. See, 14A O.S.2001 §§ 3–301–304.

16. See, 14A O.S.2001 §§ 3–508A and 508B.

17. Title 51 O.S.2001 § 1950 provides:

"This act shall be known and may be cited as the Oklahoma Rental–Purchase Act."

18. See, 59 O.S.2001 § 1952.

19. See, 59 O.S.2001 § 1954.

20. See, 59 O.S.2001 §§ 1955 and 1957.

21. See, e.g. Ala. code § 8–25–1 1993 which provides in pertinent part:

"... (5) RENTAL–PURCHASE AGREEMENT. An agreement for the use of merchandise by a consumer for personal, family, or household purposes, for an initial period of four months or less that is automatically renewable with each payment after the initial period, and that permits the consumer to become the owner of the merchandise. This term does not include any transaction wherein a consumer sells personal property to a merchant and then leases the same personal property back with or without a right to repurchase the property...."

Texas' Finance Code specifically includes sale and lease-back transactions as loans. Tex. Fin. Code Ann. § 341.001 (2001) provides in pertinent part:

"... (9) 'Loan' has the meaning assigned by Section 301.002 and includes a sale-lease-back transaction and a deferred presentment transaction...."

Other states such as Rhode Island have exempted automobiles from rental purchase agreements. R.I. Gen. Laws § 6–44–7 2001 relating to rental purchase agreements provides in pertinent part:

"This chapter does not apply to: ...

(5) Any automobile, truck, or any other vehicular and automotive equipment leases or rental agreement."

22. Title 59 O.S.2001 § 1951, see note 10, supra.

23. Even if this cause were merely about statutory construction, statutory intent is generally ascertained from the whole act, considering its general purpose and objective. *Independent School Dist. No. I–20 of Muskogee County v. Oklahoma State Dept. of Educ.*, 2003 OK 18, ¶ 13, 65 P.3d 612. Statutes are to be construed championing the broad public policy purposes underlying them. *Keating v. Edmondson*, 2001 OK 110, ¶ 8, 37 P.3d 882. In determining whether a statute applies to a given set of facts, the Supreme Court focuses on legislative intent which controls statutory interpretation. *Walker v. Group Health Ser-*

er, it is about how Aple's sale and lease-back transactions should be construed; and whether the transactions, when taken as a whole, fall within the parameters of the Rental Act or whether the transactions were actually disguised consumer loans, governed by the Consumer Credit Code.

¶ 16 The Department relies on *Sal Leasing, Inc.* v. *State ex rel. Napolitano,* 198 Ariz. 434, 10 P.3d 1221 (2000) and *Pendleton v. American Title Brokers, Inc.,* 754 F.Supp. 860 (S.D.Ala.1991) as examples in support of its argument that the transactions are not *bona fide* rental agreements governed by the Act. *Sal Leasing* involved a business which, like Aple, purchased customers' vehicles at a reduced price and leased them back to the customers with an option to repurchase. It was not licensed as either a consumer lender or pawnbroker. After the State of Arizona began investigating the company, the business sought a declaratory judgment, seeking a determination that it was not violating the State's Consumer Lender's Act. The trial court determined that the company's transactions were not consumer loans within the meaning of the Consumer Lenders Act. However, the Arizona Court of Appeals disagreed and reversed.

¶ 17 The *Sal* Court recognized that lease-purchase contracts were often used as devices to disguise usurious loans. It applied six factors to determine whether the transaction was structured as a legitimate sale with an option to repurchase or whether the vehicle was actually a security device for a loan. The *Sal* Court considered: 1) the prior negotiations of the parties; 2) the distress of the grantor; 3) the fact that the loan amount advanced was comparable to the amount that the grantor needed to pay an existing indebtedness; 4) the amount of the consideration paid in comparison to the actual value of the property in question; 5) a contemporaneous agreement to repurchase; and 6) the subsequent acts of the parties, as a means of

discerning the interpretation which they gave to the transaction. It also recognized that no one factor was conclusive, but that a combination of several factors might indicate that the entire transaction functioned as a loan rather than a *bona fide* rental agreement. After evaluating the factors, the *Sal* Court determined as a matter of law that the transactions were in reality loans in which the vehicle transfers served as security devices, and not *bona fide* sales.

¶ 18 *Pendleton, v. American Title Brokers, Inc.,* 754 F.Supp. 860 (S.D.Ala.1991), involved a company which advertised that customers could pawn their vehicle's title for quick money and keep the car. A customer signed title over to the company and leased the car back for a ten week repayment period. After the car was repossessed and the customer paid the amount owing and the fees due, the customer sued the company for violations of the Truth in Lending Act and the State's Small Loan Act. The Court determined that: 1) the rent paid was a finance charge subject to loan disclosure requirements; and 2) the company was not exempt from the requirements of the Small Loan Act because the scheme was not a *bona fide* pawnbroking activity, but rather an attempt to evade the requirements of the Small Loan Act.

¶ 19 Both *Sal* and *Pendleton* illustrate ways in which the businesses attempted to avoid being subject to laws which apply to lenders by attempting to give the appearance that rather than actually loaning money, they are doing business as something other than a lender—such as a rent-to-own business or pawnbroker. Nevertheless, in both cases, after looking at the transaction as a whole, both courts construed them to be the functional equivalent to lenders.

¶ 20 Here, the obvious purpose of the Rental Act is to regulate the transactions of either companies or persons who are in the business of providing goods to consumers

---

*vices, Inc.,* 2001 OK 2, ¶ 24, 37 P.3d 749. The purposes of the Rental Act and the Code when taken as a whole, function to protect consumers. One example is that the disclosure requirements of the Rental Act mandate that the lessor disclose whether the property is new or used. Title 59 O.S.2001 § 1954 provides in pertinent part:

"... B. A rental-purchase agreement shall disclose the following items, as applicable:
1. Whether the property is new or used...."
If sale and lease-back transactions such as Aple's were included with the confines of the Act, this requirement would be superfluous and meaning-

on a rent-to-own basis and to protect consumers. To say that Aple is in the rent-to-own business and that its rental agreements are governed by the Rental Act ignores half of the transaction—the half of the transaction where customers are forced to sell their personal property at a reduced price in order to rent it back from Aple to come up with "fast cash." [24] It disregards a situation in which Aple carries no inventory and provides no goods which are generally available to customers to rent-to-own. In short, it ignores the fact that what Aple is doing is the functional equivalent of a short term/high interest loan and that buying the car from the consumer is nothing more than a disguised attempt to hold title to the vehicle as collateral for the loaning of money by casting the transaction in terms of a "rental-purchase agreement".[25] This is contrary to the obvious purposes of both the Rental Act and the Code. Consequently, we hold that the business transactions are nothing more than

disguised loans, rather than *bona fide* sales or rental agreements, and should be regulated as such.[26] We also decline Aple's suggestion to make this decision completely prospective.[27]

## CONCLUSION

¶ 21 The obvious purpose of the Oklahoma Rental–Purchase Act [28] is to regulate the transactions of either companies or persons who are in the business of providing goods to consumers on a rent-to-own basis and to protect consumers. However, the transactions involved here, when considered as a whole, appear to be nothing more than an illusory attempt by a business to avoid lender usury laws by merely labeling the transaction a "rental-agreement." Because the business transactions are nothing more than disguised loans, rather than *bona fide* sales or rental agreements, they should be regulated by the Uniform Consumer Code [29] rather than the Oklahoma Rental–Purchase Act.[30]

---

less because Aple's customers knew that information before they ever sought money from Aple.

**24.** Circumstantial evidence of several of the factors discussed in *Sal Leasing, Inc. v. State* ex rel. *Napolitano*, 198 Ariz. 434, 10 P.3d 1221 (2000), also exist here. Factors such as: 1) the distress of the grantor; 2) the amount of the consideration paid in comparison to the actual value of the property; and 3) a contemporaneous agreement to repurchase. For example, one application shows that a customer went to Aple just before Christmas indicating that if he didn't get money he would "be in debt/no Christmas." The customer sold his vehicle to Aple for $2,500.00. A market analysis indicates that at the very least it was worth $6,000.00. The total payments on the rent-to-own transaction totaled $10,764.00.

**25.** Aple insists that the transactions could not be construed as a loan or debt because the customers could terminate the transaction by paying all the rental payments through the date of return and get the vehicle back. Aple's argument is unpersuasive and again ignores the entire transaction. Merely labeling the agreement as a rental agreement ignores that the transaction, when considered as a whole is the functional equivalent of a loan, it ignores that the consequences of a breach of the agreement have the same as a conventional car loan-loss of the vehicle. Unlike a conventional rent-to-own agreement in which the customer makes payments to rent-to-own the property, but has the option to return the property at any time and terminate the agreement, the only way Aples' customers are able to obtain any money from Aple is to first sell their previously paid for personal property and then sell the

equity in the vehicle only to buy it back at an exorbitant price.

**26.** Because we affirm the trial court, Aple's motion to tax costs on appeal is denied. See, 12 O.S.2001 § 978.

**27.** Aple argues that because it was completely unforeseeable that the Oklahoma Rental–Purchase Act would not apply to it, then this ruling should not be applied to this cause and be strictly applied prospectively. Neither the United States Constitution nor the Constitution of the State of Oklahoma delineate the effective date of judicial opinions. We may give prospective operation to our announcements when necessary to avoid disruption and to allow a period of adjustment. *Campbell v. White*, 1993 OK 89, ¶ 18, 856 P.2d 255. In making such a determination, we must consider: 1) the purpose of the new rule; 2) the extent of reliance on old doctrines; and 3) the burden likely to be imposed on administering legal process due to additional litigation or curative actions. *Short v. Kiamichi Area Vocational Technical School Dist. No. 7 of Choctaw County*, 1988 OK 89, ¶ 19, 761 P.2d 472, *cert. denied* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811. A weighing of these factors does not require that such a pronouncement be given purely prospective effect.

**28.** Title 59 O.S.2001 § 1501 et seq.

**29.** Title 14A O.S.2001 § 1–101 et seq.

**30.** Title 59 O.S.2001 § 1501 et seq.

CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT AFFIRMED.

WATT, C.J., HODGES, LAVENDER, HARGRAVE, SUMMERS, BOUDREAU, WINCHESTER, JJ., concur.

OPALA, V.C.J., concurs in part, dissents in part.