2008 OK 3

Linda GOMES, Edward B. Gomes, and Joseph Michael Coover, Co–Guardians of the Estate and Person of Alyssa Marie Gomes Coover, the minor child and next of kin of Georgette Rosa Gomes, Deceased, on behalf of Alyssa Marie Gomes Coover, and on behalf of Linda C. Gomes and Edward B. Gomes, Surviving Parents of Georgette Rosa Gomes, Deceased; and Linda Gomes and Edward B. Gomes, individually, Plaintiffs/Appellants,

v.

Akhtar HAMEED, M.D. and Jennifer L. Miles Holter, M.D., Defendants/Appellees.

No. 103,013.

Supreme Court of Oklahoma.

Jan. 22, 2008.

Rehearing Denied April 28, 2008.

John W. Norman, Oklahoma City, Oklahoma, for Plaintiffs/Appellants.

Stephen J. Rodolf, Brent L. Thompson, Elizabeth S. Reynolds, Tulsa, Oklahoma, for Defendant/Appellee Holter.

L. Earl Ogletree, Lane O. Krieger, Oklahoma City, Oklahoma, for Defendant/Appellee Hameed.

KAUGER, J.

¶1 The determinative issues are whether: 1) statutory immunity pursuant to the Good

Samaritan Act, 76 O.S.2001 § 5 *et seq.*, precludes recovery against a doctor who attempted to provide care to an emergency room patient with whom he had no contractual relationship; and 2) an agreement not to sue negotiated on behalf of a minor and/or incapacitated person requires court approval to be enforceable. We hold that the doctor is entitled to statutory immunity and that such an agreement requires court approval.

## FACTS

¶2 On June 8, 2001, seventeen year old Georgette Gomes (patient), who was in her twenty-fourth week of pregnancy when she went into premature labor, was transported to Presbyterian Hospital (hospital) in Oklahoma City, Oklahoma from Memorial Hospital in Chickasha, Oklahoma. In the course of treatment, she was given magnesium sulfate intravenously to delay and control her contractions.

¶3 Between 8:52 and 8:56 a.m. on June 9, 2001, she delivered twins. Sometime after 9:55 a.m., she stopped breathing and a code blue was called at 10:18 a.m. The appellees, Dr. Akhtar Hameed, (Hameed) and Jennifer L. Miles Holter, (Holter)(doctors) responded to the code blue. At the time, Dr. Holter was a resident participating in the University of Oklahoma College of Medicine Residency Program and Dr. Hameed was a solo practitioner visiting the labor and delivery department of the hospital "doing records and caring for his own patient." The patient was resuscitated, but she suffered permanent brain damage.

¶4 On August 30, 2001, Joe Womack, as guardian *ad litem* on behalf of the patient filed suit against the hospital for negligence. According to both doctors, sometime in February of 2003, about a month before the hospital trial began, they entered into an oral contract with the guardian's lawyer John Norman (lawyer/attorney). They allege that he agreed not to sue them in exchange for their testimony against the hospital. The lawyer contends that he merely said when asked whether he was going to sue the doctors, that he "had no plans of doing so." Although the doctors complied with the agreement, the cause ended in a verdict in favor of the hospital on March 12, 2003.

¶5 After he failed to recover against the hospital, the guardian *ad litem*, on behalf of Georgette Gomes, filed a wrongful death/negligence action against the doctors on June 5, 2003. She died on July 29, 2003, and the case was ultimately dismissed without prejudice.[1] On September 22, 2004, the appellees, the patient's parents and the father of her minor child acting as co-guardians (guardians) and represented by the same lawyer who sued the hospital, brought a wrongful death/negligence action against the doctors, asserting claims on her behalf and on behalf of her surviving child and parents.

¶6 On October 4, 2005, Doctor Holter filed a motion for summary judgment arguing that the cause should be dismissed because: 1) the attorney had breached the agreement not to sue; 2) even if the agreement were unenforceable due to lack of consideration, promissory estoppel precluded a lawsuit; and 3) the statute of frauds was inapplicable because the contract was performed within a year.[2] On October 26, 2005, Dr. Hameed

---

1. The trial court entered an order on September 25, 2003, dismissing the case for failure to issue a summons after 90 days of filing the petition. Rule 9 of the Rules for the District Courts of Oklahoma, 12 O.S.2001, Ch. 2, App., provides:

   a. In any case in which summons is not issued or waiver filed within ninety (90) days after the filing of the petition, or alias summons is not issued within thirty (30) days after return of the summons not served, the action may be dismissed by the court without notice to the plaintiff.
   b. Where an action is not diligently prosecuted, the court may require the plaintiff to show why the action should not be dismissed. If the plaintiff does not show good cause why the action should not be dismissed, the court shall dismiss the action without prejudice. A court shall dismiss actions in which no action has been taken for a year as provided in 12 O.S. 1981 § 1083.

2. According to the doctors, the agreement was reached in February of 2003, approximately one month before the hospital trial began. Title 15 O.S. Supp.2003 § 136 provides:

   The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, by an agent of the party or by a single-party broker of the party pursuant to Sections 858–351 through 858–363 of Title 59 of the Oklahoma Statutes:

also filed a motion for summary judgment arguing that: 1) he had entered into an agreement not to sue with the lawyer which had been breached; and 2) pursuant to 76 O.S.2001 § 5[3] and 59 O.S.2001 § 518[4], he was immune from liability.

¶ 7 On December 28, 2005, the trial court entered separate orders granting summary judgment in favor of the doctors without explaining the basis of its decision. The Court of Civil Appeals affirmed the trial court, determining that the doctors were entitled to summary judgment as a matter of law based on the agreement not to sue them made by counsel for the guardian of the patient to secure their assistance in the guardian's suit against the hospital. We granted certiorari on February 20, 2007.

1. An agreement that, by its terms, is not to be performed within a year from the making thereof;

2. A special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in the article on guaranty;

3. An agreement made upon consideration of marriage, other than a mutual promise to marry; or

4. An agreement for the leasing for a longer period than one (1) year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent or a single-party broker of the party sought to be charged, is invalid, unless the authority of the agent or the single-party broker be in writing, subscribed by the party sought to be charged.

3. Title 76 O.S.2001 § 5 provides in pertinent part:

a) Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself, and except as hereinafter provided.

(1) Where no prior contractual relationship exists, any person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, including licensed registered and practical nurses, who, under emergency circumstances that suggest the giving of aid is the only alternative to probable death or serious bodily injury, in good faith, voluntarily and

I.

¶ 8 THE ABSENCE OF A CONTRACTUAL RELATIONSHIP WITH AN EMERGENCY ROOM PATIENT ENTITLES A DOCTOR TO STATUTORY IMMUNITY FROM CLAIMS OF NEGLIGENCE PURSUANT TO THE GOOD SAMARITAN ACT, 76 O.S.2001 § 5 *et seq.*

¶ 9 Doctor Hameed argues that summary judgment should have been entered in his favor because, as a matter of law, he is statutorily immune from liability. He alleges that our decision in *Jackson v. Mercy Health Center, Inc.*, 1993 OK 155, 864 P.2d 839, is dispositive of the issue. The lawyer contends that Jackson is distinguishable on its facts and that even if it weren't, because Hameed did not render any care, he cannot invoke statutory immunity. Although the lawyer had apparently alleged in a previous lawsuit that "the fluid containing magnesium sulfate

without compensation, renders or attempts to render emergency care to an injured person or any person who is in need of immediate medical aid, wherever required, shall not be liable for damages as a result of any acts or omissions except for committing gross negligence or willful or wanton wrongs in rendering the emergency care.

(2) Where no prior contractual relationship exists, any person who in good faith renders or attempts to render emergency care consisting of artificial respiration, restoration of breathing, or preventing or retarding the loss of blood, or aiding or restoring heart action or circulation of blood to the victim or victims of an accident or emergency, wherever required, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care....

(b) This act shall be known and may be cited as the 'Good Samaritan Act.'

4. Title 59 O.S.2001 § 518 provides:

No person who is a licensed practitioner of a healing art in the State of Oklahoma, who in good faith renders emergency care or treatment at the scene of the emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care or treatment, and no person who is a licensed practitioner of a healing art in the State of Oklahoma shall be prosecuted under the criminal statutes of this state for treatment of a minor without the consent of a minor's parent or guardian when such treatment was performed under emergency conditions and in good faith.

was given by Defendant Akhtar Hameed,"[5] now he insists that Hameed was negligent because, by his own admission, he merely observed what was happening, rather than providing proper care.[6]

¶ 10 The immunity statutes at issue are 76 O.S.2001 § 5[7] *and* 59 O.S.2001 § 518.[8] Title 76 O.S.2001 § 5 is known as the Good Samaritan Act (the Act). It provides statutory immunity from acts of negligence when a physician renders or attempts to render emergency care.[9] In *Jackson v. Mercy Health Center, Inc.,* 1993 OK 155, 864 P.2d 839, the Court addressed the issue of whether the Good Samaritan Act, 76 O.S.1991 § 5,[10] cloaked the hospital with statutory immunity from liability for its personnel's allegedly negligent attempt to render medical aid to a hospital visitor. There, the visitor, while accompanying his pregnant wife to the operating room became dizzy and the hospital personnel helped him to take a seat. After being seated, but not secured, he fell and was injured. The visitor sued the hospital for negligence.

¶ 11 The hospital asserted that it was statutorily immune from liability pursuant to the Act. The Jackson Court recognized that the Act had abrogated the common-law rescue doctrine for medical providers in an effort to encourage them to risk assisting strangers in need of help when they had no duty to render aid. The Act provided immunity from liability for negligence to all those health care providers who, while not contrac-

tually bound to assist an injured person, render, or attempt to render, care in good faith.

¶ 12 The Court noted that Good Samaritan immunity rests on three elements: 1) the absence of a prior contractual relationship between the rescuer and the injured person; 2) the characterization of the rescuer's act as having been done in good faith, voluntarily and without compensation; and 3) the injured person's apparent need of emergency medical aid. The Court also noted that rescue is not limited to any particular place, but that it may occur anywhere——including a hospital.

¶ 13 The *Jackson* Court did not address what actions were required to qualify as rendering or attempting to render emergency care.[11] It did determine that the Act's immunity was inapplicable in the context of a hospital/patient relationship because the Act expressly requires the absence of a prior contractual relationship between the rescuer and the injured person. No hospital is ever a Good Samaritan *vis-a-vis* its own patient. However, the Court concluded that under the facts of that cause that: 1) the visitor had no contractual relationship with the Hospital which would make him a patient and thus take him out of the range of statutory immunity; and 2) the hospital was clearly responding to an apparent emergency which called for immediate action.

¶ 14 Here, Georgette Gomes' was not that of a visitor, invitee, licensee, or trespass-

---

5. The plaintiff's petition for certiorari filed on October 30, 2006 provides in pertinent part on page 4:

... The second case, CJ–2003–4702, was filed on June 5, 2003, shortly before the second anniversary of Georgette's injury, by Womank on behalf of Georgette to prevent the statute of limitations from running. The allegation against Holter and Movant was that "HCA nurses testified that the fluid containing magnesium sulfate was given by Defendant Akhtar Hameed, and that Defendant Jennifer Miles Holter said to give it...."

6. The Doctor's deposition of April 4, 2002 provides in pertinent part on p. 16:

... A. That's basically—I was just there to see if my help would be needed.
Q. Okay. Did you ever do anything in the code, yourself?
A. My help was never needed.

Q. Okay.
A. Except—
Q. So you were an observer?
A. I was an observer....

7. Title 76 O.S.2001 § 5, see note 3, supra.

8. Title 59 O.S.2001 § 518, see note 4, supra

9. Title 76 O.S.2001 § 5, see note 3, supra.

10. The version of the Good Samaritan Act, 76 O.S.1991 § 5, involved in *Jackson v. Mercy Health Center, Inc.,* 1993 OK 155, 864 P.2d 839, remains unchanged from the current version.

11. In *Jackson v. Mercy Health Center, Inc.,* see note 10, supra at ¶ 7, fn. 16, the Court noted that at issue was not whether the hospital failed to give any medical aid, but that he did not receive emergency care.

er. Her status was that of a patient with a contractual relationship to the hospital and its staff. Nevertheless, *Jackson's* rationale applies to these facts because she was not his patient: Dr. Hameed had no direct contractual relationship with her; he did not work for the hospital; and he merely happened to be at the emergency room going through records and visiting his patient when the code blue was called.

¶ 15 Whether Dr. Hameed administered the alleged overdose [12] or, as he contends, responded to the emergency call, and went into the room in an attempt to render aid, but found himself an observer of the multiple doctors and nurses who were in the room already assisting the patient, we agree that Jackson is dispositive. The doctor's conduct qualifies as rendering or attempting to render care, thus invoking the statute's protection from claims of negligence. Because the doctor is statutorily immune from claims of negligence under the Good Samaritan Act, we need not address his alleged immunity pursuant to 59 O.S.2001 § 518.[13]

## II.

¶ 16 **AN AGREEMENT NOT TO SUE WHICH WAS NEGOTIATED ON BEHALF OF A MINOR AND/OR INCAPACITATED PERSON REQUIRES COURT APPROVAL TO BE ENFORCEABLE.**

¶ 17 Although Dr. Hameed is protected by statutory immunity, Dr. Holter does not qualify for such immunity. As stated earlier, the Good Samaritan Immunity Act is based on three factors. Unlike Dr. Hameed, Dr. Holter did have a contractual relationship with the patient in that Dr. Holter was a resident working in the hospital in which the patient was being treated. Because the *Jackson* Court found that this Act does not apply to the traditional hospital/patient relationship, and because Dr. Holter does not hold the status as "visitor" as was the case for Dr. Hameed, Dr. Holter does not qualify for immunity. Nevertheless, she argues that summary judgment was proper because: 1) no substantial controversy exists regarding the alleged agreement not to sue; and 2) an attorney's actions bind the client without regard to age or incapacity. The lawyer insists that an agreement never existed and that even if it did, it would be unenforceable without court approval.

¶ 18 A contract is an agreement to do or not to do a certain thing.[14] Every contract results from and offer and acceptance.[15] The facts are clearly disputed as to whether an offer was made, much less accepted.[16] The question of whether the minds of the parties ever met in complete agreement is a question of fact for the jury.[17] Because the issue of the existence of a contract is a question of fact,[18] summary judg-

12. See discussion ¶ 9, supra.

13. Title 59 O.S.2001 § 518, see note 4, supra. Unlike 76 O.S.2001 § 5, see note 3, supra, which applies to "an accident or emergency, wherever required," § 518 is specifically limited to "emergency care or treatment at the scene of the emergency."

14. Title 15 O.S.2001 § 1.

15. *Garrison v. Bechtel Corp.*, 1995 OK 2, ¶ 18, 889 P.2d 273; *National Outdoor Advertising Co. v. Kalkhurst*, 1966 OK 85, ¶ 13, 418 P.2d 661; *Sims v. United Bridge & Iron*, 1965 OK 91, ¶ 11, 402 P.2d 911.

16. The doctor attached her affidavit to her motion for summary judgment contending that she entered into an oral contract with the lawyer to forgo filing a suit against her in exchange for testimony in the hospital lawsuit. The record also contains an affidavit from the attorney who represented the doctors in the hospital case who also insist that a verbal agreement was reached. The attorney, in his objections to the motions for summary judgement, specifically denies that an oral agreement was entered into, requested or obtained and attaches his own affidavit in support of his statements.

17. *J.B. Klein Iron & Foundry Co. v. Midland Steel & Equipment Co.*, 1938 OK 385, ¶ 0, 83 P.2d 157; *Cosden Oil & Gas Co. v. Moss*, 1928 OK 352, ¶ 0, 131 Okla. 49, 267 P. 855;. Questions of fact arising from a contract are determined by the trier of fact. *GRP of Texas, Inc., v. Eateries, Inc.*, 2001 OK 53, ¶ 15, 27 P.3d 95.

18. Because disputed fact issues concerning the existence of the contract exist, fact issues regarding whether the elements of promissory estoppel would be met even if it were applicable also

ment was premature.[19]

¶ 19 Nevertheless, a novel question remains as to whether such an agreement is enforceable. The doctor argues that an attorney may act as an agent of a client but she provides no authority under which an attorney has been allowed to waive the right to sue on behalf of a minor or incapacitated person—nor does research reveal any controlling authority.

¶ 20 The lawyer relies on *Creech v. Melnik, M.D.,* 147 N.C.App. 471, 556 S.E.2d 587 (N.C.App.2001), a similar case, as persuasive authority to illustrate that the alleged agreement is unenforceable without court approval. In *Creech v. Melnik,* supra, the North Carolina Court of Appeals decided a case which involved parents who, in their capacity as guardians *ad litem,* brought a medical malpractice action against a doctor alleging that the doctor provided negligent treatment to their son. Before filing the action, the plaintiff's attorney spoke with the doctor on several occasions, allegedly assuring the doctor that they would not sue her if she spoke with him concerning the events surrounding the child's birth. The trial court granted summary judgment in favor of the doctor under the affirmative defenses of equitable estoppel and breach of implied contract not to sue. After the cause was remanded on appeal, a jury returned a verdict in favor of the doctor on the grounds that the plaintiffs breached their implied contract not to sue. The plaintiffs appealed, arguing that: 1) the attorney did not have the authority to contract on behalf of the minor; and 2) there was no evidence which showed that a court

had reviewed and approved the alleged contract on behalf of the minor.

¶ 21 In *Creech v. Melnik,* supra, the appellate court determined that court approval was required to create a valid contract involving a minor. Because the record showed no evidence that the "implied" contract with the subject minor was investigated and approved by a court, it reversed the jury verdict. The court reasoned that court investigation and approval were necessary because:

1) historically, courts have provided special protections for minors in general contractual relations which allowed contracts to be avoided or disaffirmed;

2) infants are regarded as entitled to special protection of the State as wards of the court because courts are the supreme guardians of all infants and their personal and property rights;

3) courts have the inherent authority over the property of infants and will exercise jurisdiction whenever it is necessary to preserve and protect children's estates and interests;

4) settlement of a minor's tort claims are effective only after judicial examination and adjudication; and

5) a next of friend, guardian *ad litem,* or guardian cannot consent to a judgment or compromise without investigation and approval by the court.

¶ 22 We need look no further than our case law and statutes to reach the same result as the Creech Court. A guardian is a person appointed by the court to care for the person or property of another.[20] A

exist. *See, Russell v. Board of County Com'rs, Carter County,* 1997 OK 80, ¶ 27, 952 P.2d 492. Consequently we need not address the applicability of promissory estoppel at this juncture.

19. A motion for summary judgment should be sustained only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law. *Green v. Harris,* 2003 OK 55, ¶ 11, 70 P.3d 866; *K & K Food Services, Inc. v. S & H, Inc.,* 2000 OK 31, ¶ 16, 3 P.3d 705; *Skinner v. Braum's Ice Cream Store,* 1995 OK 11, ¶ 9, 890 P.2d 922. All conclusions drawn from the evidentiary materials submitted to the trial court are viewed in the

light most favorable to the party opposing the motion. *Green v. Harris,* supra; *K & K Food Services, Inc. v. S & H, Inc.,* supra; *Phelps v. Hotel Management, Inc.,* 1996 OK 114, ¶ 7, 925 P.2d 891. Even when basic facts are undisputed, motions for summary judgment should be denied, if under the evidence, reasonable persons might reach different conclusions from the undisputed facts. *Green v. Harris,* supra; *Prichard v. City of Oklahoma City,* 1999 OK 5, ¶ 19, 975 P.2d 914; *Kraszewski v. Baptist Medical Center of Oklahoma,* 1996 OK 141, ¶ 6, 916 P.2d 241.

20. Title 30 O.S.2001 § 1–105 provides:

A guardian is a person appointed by the court to take care of the person or property of another.

guardian *ad litem* is a person appointed by the court to assist the subject of a proceeding in making decisions or to make decisions when the subject of a proceeding is incapable of making decisions even with assistance.[21] A minor is a person under the age of 18,[22] and an incapacitated person is one who is physically or mentally impaired.[23] We have long recognized that minors and incompetent or incapacitated persons are the special wards of the court and that a guardian *ad litem* of a minor child is the arm of the court extended to persons unable to look after their own interests.[24]

The appointment of a guardian is statutorily governed by the Oklahoma Guardianship and Conservation Act. Title 30 O.S.2001 § 1–101 et seq. The purpose of the Act is to promote the welfare of citizens and provide protection of rights and management of financial resources for minors and incapacitated persons. Title 30 O.S.2001 § 1–103 provides:

A. It is the purpose of the Oklahoma Guardianship Act to promote the general welfare of all citizens by establishing a system of general and limited guardianships for minors and for incapacitated and partially incapacitated persons which provides for the protection of their rights and the management of their financial resources.

B. It is the purpose of the system of general and limited guardianships for incapacitated and partially incapacitated persons established by this act to provide for the participation of such persons, as fully as possible, in the decisions which affect them. It is the intent of the Oklahoma State Legislature:

1. That the court shall exercise the authority conferred by the Oklahoma Guardianship Act so as to encourage the development of maximum self-reliance and independence of the incapacitated or partially incapacitated person and make appointive and other orders only to the extent necessitated by the mental and adaptive limitations or other condition of the incapacitated or partially incapacitated person warranting the procedure;

2. That in performing their duties and exercising their powers, guardians and limited guardians of incapacitated or partially incapacitated persons shall:

a. assure, to the extent reasonably possible, that the rights of the wards for whom they are appointed are protected;

b. encourage, to the extent reasonably possible, incapacitated or partially incapacitated persons to participate to the maximum extent of their abilities in all decisions which affect them and to act on their own behalf on all matters in which they are able to do so within the limitations imposed by the court; and

c. as appropriate, assist their wards to develop or regain to the maximum extent possible their capacity to meet the essential requirements for their health or safety, or to manage their financial resources or both.

21. Title 30 O.S.2001 § 1–111 provides in pertinent part:

... 'Guardian ad litem' means, with respect to a guardianship proceeding, a person appointed by the court to assist the subject of the proceeding in making decisions with regard to the guardianship proceeding, or to make said decisions when the subject of the proceeding is wholly incapable of making said decisions even with assistance; ....

22. Title 15 O.S.2001 § 13 provides:

Minors, except as otherwise provided by law, are persons under eighteen (18) years of age. The period thus specified must be calculated from the first minute of the day on which a person is born to the same minute of the corresponding day completing the period of minority.

23. Title 30 O.S.2001 § 1–111 provides in pertinent part:

A. As used in the Oklahoma Guardianship and Conservatorship Act: ...

12. "Incapacitated person" means a person eighteen (18) years of age or older:

a. who is impaired by reason of:

(1) mental illness as defined by Section 1–103 of Title 43A of the Oklahoma Statutes,

(2) mental retardation or developmental disability as defined by Section 1–818.2 of Title 63 of the Oklahoma Statutes,

(3) physical illness or disability,

(4) drug or alcohol dependency as defined by Section 3–403 of Title 43A of the Oklahoma Statutes, or

(5) such other similar cause, and

b. whose ability to receive and evaluate information effectively or to make and to communicate responsible decisions is impaired to such an extent that said person:

(1) lacks the capacity to meet essential requirements for his physical health or safety, or

(2) is unable to manage his financial resources. Whenever in the Oklahoma Statutes the term "incompetent person" appears and refers to a person who has been found by a district court to be an incompetent person because of an impairment or condition described in this paragraph it shall have the same meaning as "incapacitated person" but shall not include a person who is a partially incapacitated person; ...

Title 15 O.S.2001 § 16 provides:

Persons of unsound mind within the meaning of this chapter are incapacitated persons, as such terms are defined by Section 1–111 of Title 30 of the Oklahoma Statutes.

24. *American Inv. Co. v. Brewer*, 1918 OK 741, ¶ 6, 181 P. 294.

¶ 23 A court has broad authority to appoint a guardian *ad litem* for a minor's protection whenever necessary to defend the interests of a minor.[25] A guardian *ad litem* is not permitted to waive any of the substantial rights of the ward or to consent to anything which would prejudice the minor's rights.[26] Upon appointment, a guardian *ad litem* becomes an officer of the court and is charged with the duty of protecting the rights of a minor for the State in its role as *parens patriae*.[27] It is the duty of the court to guard with jealous care the interests of minors in actions involving their rights and every presumption is indulged in favor of the minor. If a guardian *ad litem* fails to properly discharge their duty, it becomes the imperative duty of the court to protect the infant's rights.[28]

¶ 24 In *Hamilton By and Through Hamilton v. Vaden*, 1986 OK 36, ¶ 12, 721 P.2d 412, we addressed whether the minority of a surviving child tolled the limitation period for a wrongful death suit and described the general policy of protection of minor's interests. The Court noted that:

... The mere existence of a guardian ad litem or next friend does not remove from the court's consideration the infirmities caused by the child's minority. It is the policy of the law generally, and of our statutes in particular, to protect minor litigants' interests. Oklahoma law places an affirmative duty on the courts to preserve and protect the rights of a minor even when the child is represented by a guardian ad litem or next of friend.

A guardian ad litem, or next friend, is not permitted to waive any of the substantial rights of the ward or to consent to anything which would prejudice the minor's rights. If the appearance of a next friend sufficed to remove the minority-based disability of the child, these added protections would be unnecessary....

It is the duty of the courts sedulously to guard the rights of minors. No presumption against an infant is permitted; rather every presumption is indulged in his/her favor. A guardian ad litem must present every issue available on behalf of the child. If the guardian fails properly to discharge the duties of guardianship, the responsibility devolves upon the courts acting on behalf of the state to protect the best interest of the child. Courts cannot assume that parents will act effectively to protect the rights of their children; and it is neither reasonable nor realistic to rely upon parents (who may themselves be minors, or who may be ignorant, lethargic, or unconcerned) to bring an action within the time provided. It is equally unreasonable to expect a minor, whose parents fail timely to vindicate his/her legal rights, independently to seek out another adult willing to serve as next friend. To do so would ignore the realities of the family unit and the limitations of children....

¶ 25 In *Lambert v. Hill*, 1937 OK 331, ¶ 9, 73 P.2d 124, an attorney and a guardian *ad litem* entered into a release and satisfaction of a judgment on behalf of a minor. The Court recognized that the weight of authority supported the doctrine that a compromise or agreement of satisfaction entered into on behalf of a minor would require consent and

---

25. Title 30 O.S.2001 § 1–117 provides:

A. Nothing contained in this title affects or impairs the power of any court to appoint a guardian ad litem to defend the interests of any minor interested in any suit or matter pending therein.
B. At any point in a guardianship proceeding, the subject of the proceeding, his attorney, the guardian of the subject of the proceeding or anyone interested in the welfare of the subject of the proceeding may file an application to have a guardian ad litem appointed by the court, or the court on its own motion may appoint a guardian ad litem. If not precluded by a conflict of interest, a guardian ad litem may be appointed to represent several persons or interests.

26. *Stephens v. Stephens*, 1957 OK 110, ¶ 4, 311 P.2d 241; *Woods v. State*, 1952 OK 143, ¶ 5, 249 P.2d 99; *Franklin v. Margay Oil Corp.*, 1944 OK 316, ¶ 42, 153 P.2d 486.

27. *Hoffman v. Morgan*, 1952 OK 199, ¶ 17, 245 P.2d 67, 30 A.L.R.2d 1141. See also, *Ex Parte Walters*, 1950 OK CR 85, 221 P.2d 659, 666 (A child is primarily a ward of the sate and the sovereign has inherent power to legislate for welfare of child.).

28. *Tanner v. Schultz*, 1924 OK 119, ¶ 0, 223 P. 174; *In re Hildebrand's Estate*, 1921 OK 128, ¶ 7, 197 P. 445; *In re Sanders' Estate v. Sanders*, 1917 OK 468, ¶ 0, 168 P. 197; *Bolling v. Campbell*, 1912 OK 581, ¶ 0, 128 P. 1091.

approval of a court. Even though the agreement was not presented to the trial court at the time it was made, it was later reviewed at a hearing and approved by the trial court. Consequently, the transaction was affirmed on appeal.

¶ 26 Although many of our cases involve minors, the same rationale that supports protection of minors also supports protection of incapacitated or incompetent persons. Whenever a minor or incapacitated person is involved in circumstances which give rise to legal action, suit must be brought by a representative to ensure that their interests are protected.[29] An infant's right to rescind a contract is unaffected by approval or consent by a parent.[30] Pursuant to 30 O.S.2001 § 4–702, when a guardian compromises and settles a lawsuit on behalf of the ward, the settlement is subject to court approval.[31]

¶ 27 It would be incongruous to require court approval of compromises and settlements of legal actions or agreed releases and satisfactions in settlement of judgments on behalf of minors or incapacitated persons, but allow a covenant not to sue or a release of a cause of action on behalf of a minor or incapacitated person to remain enforceable without court investigation or approval. Enforcement without court approval would allow the court to abandon its duty to guard the interests of minors in actions involving their rights. However, *Lambert v. Hill,* supra, illustrates that the contract need not be approved before the exchanged promises are performed. While we hold that an agreement not to sue which is negotiated on behalf of a minor or incapacitated person must be approved by the court to be enforceable,[32] there is no impediment to having such a contact tendered for judicial approval upon remand.[33]

¶ 28 Neither the United States Constitution nor the Constitution of the State of

29. Title 12 O.S.2001 § 2017 provides in pertinent part:
... C. INFANTS OR INCOMPETENT PERSONS. Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person....

30. *Gage v. Moore,* 1948 OK 214, ¶ 8, 198 P.2d 395. Some states recognize that absent judicial or statutory authority, parents have no authority to release a cause of action belonging to their child. For a discussion of the issue, see *Scott v. Pacific West Mountain Resort,* 119 Wash.2d 484, 834 P.2d 6, 11–12 (1992).

31. Title 30 O.S.2001 § 4–702 provides:
A guardian must settle all accounts of the ward, and demand, sue for, and receive all debts due to the ward, or may, with the approval of the court, compromise or compound for the same and give discharges to the debtors on receiving a fair and just settlement of such claim. A guardian shall appear for and represent the ward in all legal suits and proceedings, unless another person is appointed for that purpose as guardian or next friend. A

guardian, with the approval of the court exercising jurisdiction in the suit or proceeding, may compromise and settle any claim made by, on behalf of or against the ward in such suit or proceeding.
When a judgment is rendered against a minor who is not represented by a guardian ad litem, it is voidable. *Allen v. Hickman,* 1963 OK 156, ¶ 4, 383 P.2d 676; *Stephenson v. Stephenson,* 1945 OK 159, ¶ 5, 167 P.2d 63.

32. *See, Tanner v. Schultz,* note 28, supra; *In re Hildebrand's Estate,* note 28, supra; *In re Sander's Estate v. Sanders,* note 28, supra; *Bolling v. Campbell,* note 28, supra. [It is the duty of the court to guard with jealous care the interests of minors in actions involving their rights and every presumption is indulged in favor of the minor and in the case of the failure of a guardian *ad litem* to properly discharge their duty, it becomes the imperative duty of the court to protect the infant's rights.]. *See also, Ex Parte v. Walters,* note 27, supra [A child is primarily a ward of the sate and the sovereign has inherent power to legislate for welfare of child.]. *See also, Creech v. Melnik,* 147 N.C.App. 471, 556 S.E.2d 587, 591 wherein the Court discusses the inherent authority of courts over the property of infants and the necessity to exercise jurisdiction whenever necessary to preserve and protect children's estate and interests. Also noting that the court looks closely into contracts or settlements materially affecting the rights of infants.

33. *See, Lambert v. Hill,* 1937 OK 331, ¶ 14, 73 P.2d 124. [The fact that the agreement was not

Oklahoma delineate the effective date of judicial opinions. We may give prospective operation to our announcements when necessary to avoid disruption and to allow a period of adjustment.[34] In making such a determination, we must consider: 1) the purpose of the new rule; 2) the extent of reliance on old doctrines; and 3) the burden likely to be imposed on administering the legal process due to additional litigation or curative actions.[35] A weighing of these factors persuades us to give today's pronouncement effect in this cause and to prospectively govern those clams which arise after the effective date of today's pronouncement.

## CONCLUSION

¶ 29 Title 76 O.S.2001 § 5[36] has been applied where no prior contractual relationship existed with the person in need of emergency care. The undisputed facts show that nature of the relationship between Dr. Hameed, the hospital and the patient entitle the doctor to the application of § 5 to provide statutory immunity as a matter of law. Consequently, summary judgment on this issue is affirmed.

■■■ ¶ 30 Insofar as Dr. Holter is concerned, disputed facts exist regarding whether a contract not to sue was entered. Nevertheless, even if a contract were agreed upon, the courts have a duty to protect the interest of minors and incapacitated and incompetent persons. This duty requires that an agreement not to sue allegedly negotiated on behalf of a minor and/or incapacitated person be investigated and approved by the court before any substantial rights are waived or the minor's rights are prejudiced. However, there is no impediment to the trial court approving such an agreement, if it exists, on remand. Today's ruling governs this cause and prospectively those claims which arise after the effective date of today's pronouncement.

### TRIAL COURT REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

EDMONDSON, V.C.J., HARGRAVE, KAUGER, WATT, COLBERT, JJ., concur.

OPALA, J., dissents.

TAYLOR, J., concurs in part, dissents in part, with whom WINCHESTER, C.J., joins:

I concur in Part I. I dissent to Part II. For the same reasons stated by the Court of Civil Appeals, I would enforce the agreement not to sue. This agreement was negotiated by the plaintiff's counsel in order to secure the physicians' assistance in the plaintiff's suit against the hospital. The plaintiff accepted

---

presented to the court for its approval until some considerable time later would not preclude the trial court from examining into the same with equal force and effect as if the matter had been presented promptly. The court in examining into the matter at a later date may and should take into consideration any harm which might have resulted to the minor, but that consideration is of no more importance than any other equitable considerations which might enter into the court's determination of the entire matter.]. The lawyer provides no authority which would require judicial approval of a minor's agreement not to sue before the promise's rendered performance as her *quid pro quo*. This norm is fully consistent with the common-law rule that contracts on behalf of minors for counsel fees my be entered into sans judicial approval, but the reasonableness of the fee amount set by the contract my be inquired into for its approval after the legal services have been performed. See, *Abel v. Tisdale*, 1980 OK 161, ¶ 11, 619 P.2d 608. [In determining a reasonable attorney's fee for services performed on behalf of minors, the use of hindsight has been held to be proper, and under this approach the court should not attempt solely to assess the reasonableness of a contingent fee agreement at the time it was entered.].

**34.** *Aple Auto Cash Express, Inc., v. State ex rel. Oklahoma Dept. of Consumer Credit*, 2003 OK 89, ¶ 20, fn. 27, 78 P.3d 1231; *Campbell v. White*, 1993 OK 89, ¶ 18, 856 P.2d 255. In *Great Northern Railway v. Sunburst Oil & Refining* Co., 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932), a noncriminal case involving no question of constitutional law, the Court developed the Sunburst Doctrine, holding that a state may choose for itself between the principle of relation back and forward operation of its precedents. *Globe Life and Acc. Ins. Co. v. Oklahoma Tax Com'n*, 1996 OK 39, ¶ 20, fn. 41, 913 P.2d 1322.

**35.** *Aple Auto Cash Express, Inc., v. State ex rel. Oklahoma Dept. of Consumer Credit*, see note 34, supra; *Short v. Kiamichi Area Vocational Technical School Dist. No. 7 of Choctaw County*, 1988 OK 89, ¶ 19, 761 P.2d 472, *cert. denied* 489 U.S. 1066, 109 S.Ct. 1341, 103 L.Ed.2d 811.

**36.** Title 76 O.S.2001 § 5, see note 3, supra.

all benefits of that agreement. The physicians acted in reliance upon the agreement.

REIF, J., disqualified.

OPALA, J., dissenting

¶ 1 The court reverses today a trial court order sustaining a physician's (Holter) plea in bar based on her contractual immunity from suit. Today's pronouncement **declares and gives retrospective effect to a new rule of Oklahoma common law** which **requires** judicial approval of a covenant not to sue that is made on behalf of a minor plaintiff in tort. The court's opinion gives this plaintiff[1] alone the benefit of the newly crafted norm.

¶ 2 I recede from the court's opinion. State due process is violated by today's retroactive application of a newly crafted norm of Oklahoma common law given birth in the face of a total past jurisprudential silence and absent any testimonial proof of the norm's pre-existence in Oklahoma practice by long-established and widespread antecedent use. Short of such probative underpinnings, a newly pronounced rule of state common law must be applied only prospectively. Lawyers and litigants should be accorded adequate notice before they may be expected to conform their contracts for immunity to some obscure rule of local common law plucked from nowhere which stands unsupported by proof of its actual existence in pre-pronouncement practice. Even if the norm were to be made applicable prospectively

only, I would prefer awaiting the completion of an ALI examination and its full consideration of the new norm's impact on the existing common law.[2] Moreover, I would be most hesitant to deal today with the problem of a new norm's recognition. **Neither the factum of plaintiff's promise not to sue nor the binding force of the contract that gave birth to the claimed immunity was either directly or obliquely presented to the trial court for its resolution.**

I

**THE HASTE SHOWN TODAY IN THE PROCESS OF ADOPTING A NEW NORM OF OKLAHOMA'S COMMON LAW IS INCONSISTENT WITH THE LONG ACCEPTED NATIONAL STANDARD OF THE ALI FOR RECOGNIZING CHANGES IN NORMS OF UNENACTED LAW PRIOR TO THEIR INCLUSION IN THE RESTATEMENT**

A.

**The ALI's Restatements Of Law Carefully And Deliberatively Monitor And Track The Development And Growth Of American Common Law**

¶ 3 Restatements of the common law on chosen subjects have long been recognized as a material source for tracking or monitoring the development and growth of common-law norms.[3] The American Law Institute (ALI),

---

1. Because originally there was only one plaintiff in this tort case (the minor), all references made here to the plaintiffs are in the singular.

2. See Part I *infra* for a discussion of the ALI's [American Law Institute] restatement-of-law process for recognition of additions to the accepted norms of common law.

3. Shirley S. Abrahamson, *Refreshing Institutional Memories: Wisconsin and the American Law Institute, The Fairchild Lecture*, 1995 Wis. L.Rev. 1, 3 (1995), where the author states: "... The restatements 'provide lawyers and judges with carefully formulated descriptions of the [common] law and traditionally have served as authoritative guides for both legal briefs and judicial opinions.'" (emphasis supplied). The ALI restatements are scholarly "codifications of American common law in various substantive law areas, based upon the decisions of the courts

of last resort of the states." (emphasis added). Winters, The Contribution of Professional Organizations To Stability And Change Through Law 265, 269 (1963). As one legal commentator noted, "Because of the reputation enjoyed by the ALI among judges and practitioners, and because restatement 'black letter' rules are accompanied by thorough research, they are often used and cited. In this fashion, an ALI restatement of a rule can confirm that it is accepted by all or nearly all of the states. When such a degree of acceptance does not exist, the restatement makes that clear as well." David Gruning, *Pure Economic Loss in American Tort Law: An Unstable Consensus*, 54 Am. J. Comp.L. 187, 190 (2006). According to Chief Justice Wilkins (of the Massachusetts Supreme Judicial Court), "The American Law Institute has been a major force in the sound development of American law. Its monumental first Restatements, pronouncing on the fundamental principles of the common law, have

a private national organization of judges, practitioners, and law teachers,[4] crafts the restatements, whose purpose is to identify, simplify and clarify selected common-law norms.[5] **The restatement process is slow and deliberative.**[6] An ALI restatement on a given legal subject is developed gradually over a period of years.[7] Today's hasty recognition of a new state common-law norm shortcuts severely the accepted restatement process by adopting into Oklahoma law a new legal norm on the basis of a single state's jurisprudential development of very recent vintage.

## B.

## Today's Adoption of a Yet Untested Legal Norm From a Single State's Jurisprudence Imposes A Severe Restriction On the Freedom of Advocacy

¶ 4 Today's adoption of an untested legal norm from North Carolina [8] imposes a severe restriction upon the freedom of advocacy without the analytical benefit of an ALI examination and full consideration of the new norm's impact on the legal system and on the existing common law. While settled Oklahoma common law recognizes a court's duty to protect a minor from liability for an excessive attorney's fee [9] and from an inadequate in-court settlement of a minor's claim,[10] **that**

greatly influenced the advancement and unification of legal principles in this country. Revisions of the initial Restatements have permitted the Institute to reassess stated principles and to recognize developing concepts." Herbert P. Wilkins, *Symposium On the American Law Institute: Process, Partisanship, and the Restatements of Law*, 26 Hofstra L.Rev. 567 (1998).

4. Founded in 1923, the ALI is a non-profit organization of approximately 3,500 lawyers, law professors and judges. The ALI was established during a period when both the federal and state courts were developing and administering common law. *Swift v. Tyson*, 41 U.S. 1, 18, 16 Pet. 1, 10 L.Ed. 865 (1842)(the Court articulated a doctrine of general federal common law). *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which ended the *Swift* era, required federal courts in deciding a diversity case to apply state substantive law except in matters governed by the federal constitution or by acts of Congress. For a history of the ALI, see Herbert F. Goodrich, *The Story of the American Law Institute*, 1951 Wash.U.L.Q. 283 (1951); Stuart M. Speiser, Charles F. Krause & Alfred W. Gans, 1 The American Law Of Torts § 1:18 at 61 (1983); *Abrahamson, supra* note 3, at 7–24.

5. *Abrahamson, supra* note 3, at 3.

6. When the ALI Council (the ALI's 60–member governing body) selects a project, a reporter is appointed to draft the restatement. The reporter is "generally a law professor" and "should be an expert in the field" who has "in all probability, written extensively about the subject." *Abrahamson, supra* note 3 at 2. **For a discussion of the restatement process** see James A. Henderson, Jr. and Aaron D. Twerski, *What Europe, Japan, and Other Countries Can Learn from the New American Restatement of Products Liability*, 34 Tex. Int'l L.J. 1, 6 (1999). "Altogether, at least a dozen formal drafts, published in softcover and widely circulated among ALI members, were discussed, debated, criticized, and revised over the

five-year life of the project. The Reporters met with one group or another in formal sessions at least six times each year and presented drafts at Annual Meetings in 1994, 1995, 1996, and 1997. Thousands of written suggestions were received and considered by the Reporters, and countless hours were spent in person and on the telephone discussing every conceivable aspect of the project. Reported appellate court decisions and statutes spanning a thirty-year period were examined, classified, and relied on as the basis for the black letter rules and supporting comments. All of this research is included in the finished form of extensive Reporters' Notes." *Id* at 6. See also 1 Madden & Owen on Products Liability § 5:10 Restatement Third, Torts: Products Liability–Generally; Michael F. Sturley, *Restating the Law of Marine Insurance: A Workable Solution to the Wilburn Boat Problem*, 29 J. Mar. L. & Com. 41, 52 (1998).

7. *Id.*

8. The affidavit by plaintiff's counsel attacks the "purported agreement" as invalid because it was neither "investigated nor approved by the trial court." For this view counsel relies solely on a North Carolina common-law rule announced in *Creech v. Melnik, M.D.*, 147 N.C.App. 471, 556 S.E.2d 587 (2001). There the court held that an implied contract not to sue a physician in exchange for information and for her favorable medical opinion, which the parents' attorney allegedly entered into on behalf of a minor, was invalid without "investigation and approval by the trial court."

9. A counsel-fee contract on behalf of a minor need only be approved for its reasonableness. *Abel v. Tisdale*, 1980 OK 161, ¶¶ 14–17, 619 P.2d 608, 610–11; *Sneed v. Sneed*, 1984 OK 22, ¶¶ 3–4, 681 P.2d 754, 756.

10. Settled Oklahoma common law requires only that an in-court settlement of a minor's claim be

**is not an issue before us.** There is no showing here of a single weighty element of public policy that would convincingly justify judicial intervention in private attorney-client relationships.

¶ 5 The contract tendered in this case as the basis of a physician's plea in bar based on her contractual immunity deals solely with a tort lawyer's trial strategy. By that strategy immunity from suit was allegedly extended to a physician in exchange for her favorable testimony in a minor's tort case against a hospital.[11] I would not restrict an advocate's strategy choices by injecting the judiciary into a field in which it lacks the same quantum of expertise as that possessed by a practitioner.[12]

¶ 6 For the reasons to be explained in Part II *infra*, even if I were inclined to join today's pronouncement, I would **not in this case** give retrospective sweep to the rule's efficacy in order to relieve this tort plaintiff from her contractual obligation.

approved by the trial court. *Abel v. Tisdale, supra* note 9, at ¶¶ 14–17, 619 P.2d at 610; *Kirkpatrick v. Chrysler Corp.*, 1996 OK 136, ¶ 19, 920 P.2d 122, 129 n. 4.

11.   There appears to be no need for judicial intrusion upon a lawyer's freedom to choose strategy by electing which is more valuable—a right to sue a physician or that doctor's favorable testimony in a trial against another party charged with the same tort. Moreover it would be injurious to the development of an effective litigation course to create a filed court record of matters that relate to one party's strategy. An imposition of such rigid and onerous requirement for all litigation strategy choices in lawsuits brought for minors would enlarge a lawyer's liability for an improvident granting of immunity and may create new liability for those professionals who fail to submit for judicial approval every component of their litigation game plan.

12.   Today's pronouncement calls on a judge to act in restraint of advocacy without in-depth knowledge of the strategy choices available to a lawyer. Lawyers who are advocates in practice are in the best position to assess the advantage to be derived from testimony against the weaker defendant. There is no general principle of common law, and none has been shown here, that subjects to judicial supervision any major or minor trial strategy decisions in the prosecution or defense of a case for a minor. The common law of England and its equivalent in other states do

## II

## GIVING *RETROSPECTIVE EFFECT* TO THE HASTILY ADOPTED NEW NORM OF OKLAHOMA COMMON LAW VIOLATES THE DUE PROCESS CLAUSE OF THE OKLAHOMA CONSTITUTION, ART. 2, § 7

### A.

### Judicial Development Of Unenacted Law Norms Is Guided By Different Process From That Which Is Employed When Dealing With Enacted Law

¶ 7 Federal constitutional law fails to provide a meaningful precedent for according either retroactivity or prospectivity to a pronouncement of a new common-law norm. We are dealing here not with **enacted norms of constitutional law** but rather with **unenacted (unwritten[13]) law rules** plucked from a single foreign court decision. Had the norm chosen for today's adoption been **one of English common law,** which lawyers are presumed to know, it could have been im-

not generally restrict a lawyer's freedom to make critical strategy choices in the course of litigating for a minor by requiring that there be judicial approval of every decision. Neither is there any Oklahoma jurisprudence that declares a party's decision on trial strategy to be a matter of judicial concern.

13.   The unwritten law—earlier known by the Latin name of *lex non scripta regni Angliae*—is the **non-statutory law** of the kingdom of England and Wales, **also called the common law,** which originated from custom and judicial decisions. *Brown v. Ford*, 1995 OK 101, ¶ 10 n. 32, 905 P.2d 223, 229; *Great Plains Federal Sav. and Loan Ass'n v. Dabney*, 1993 OK 4, ¶ 4, n. 19, 846 P.2d 1088, 1096 (Opala, J., concurring); *McCormack v. Oklahoma Pub. Co.*, 1980 OK 98, ¶ 7, 613 P.2d 737, 740. The **common law is distinct from written (constitutional or statutory) law** in that the doctrines of the former are open to judicial repudiation, modification and expansion, while the constitution and statutes are not so elastic. *Deffenbaugh v. Hudson*, 1990 OK 37, ¶ 15, 791 P.2d 84, 88. "The common law, followed in Oklahoma, refers not only to the ancient unwritten law of England, but also to that **body of law created and preserved by decisions of courts.** The common law is not static, but is a dynamic and growing thing and its rules arise from the application of reason to the changing conditions of society. Flexibility and capacity for growth and adaptation is its peculiar boast and excellence." *McCormack, supra.*

planted without added study.[14] When we are dealing with a **norm of common law in the state**, its pre-existence (existence antecedent to today's pronouncement) could be established either by extant state jurisprudence or, in its absence, by expert testimonial proof of the norm's general acceptance in the state by long-established and widespread use.[15] But if the rule to be adopted today is **one of American common law** but found neither in Oklahoma jurisprudence nor in the common law of England, litigants and their lawyers should not be bound to notice its existence *sans* proof.

### B.

### A Court May Not Give Retroactive Effect To A New Norm Of Oklahoma Common Law Whose Pre–Existence—Antecedent To Its Judicial Pronouncement—Has Not Been Established of Record

¶ 8 There is no record proof here that shows a pre-existent Oklahoma anchor for the attempted transplantation of the common-law norm. The court applies neither the common law of England nor an established state common law. Instead it recog-

nizes a legal norm **plucked** from a single sister state's body of common law of which no one may be bound to have knowledge. **In the absence of knowledge and testimonial proof of the rule's pre-existence in Oklahoma practice, it is inherently unfair to impose the new norm retroactively and bind the physician in this case.[16] In short, today's retrospective application of the North Carolina common-law norm to benefit the plaintiff violates the due process clause of the Oklahoma Constitution.[17]**

### III

### THE TRIAL COURT'S DISMISSAL ORDER FROM WHICH AN APPEAL WAS BROUGHT DETERMINED BUT A SINGLE ISSUE *DEHORS* THE PLAINTIFF'S CLAIM; NO ISSUE PERTAINING TO THE CLAIM OR DEFENSES AGAINST THE CLAIM WAS DECIDED BELOW

¶ 9 This appeal is neither from a summary judgment nor from any other judgment [18] for Dr. Holter. The trial court's disposition does not deal with a single issue on the merits of the case.[19] The so-called judgment is a

14. By the mandate of 12 O.S.2001, § 2, the common law remains in full force in this state, "unless a statute explicitly provides to the contrary." The common law is drawn from three sources— the common law of England, of other states and of Oklahoma. Had the norm sought to be adopted here been one of English common-law origin, there would be no impediment to making it retroactive because lawyers should know the common law of England which stands recognized in Oklahoma practice.

15. The existence of a rule of Oklahoma common law cannot be drawn from a vacuum. The sources for the common-law norm advanced by the plaintiff should have been offered to establish its existence to the satisfaction of the trial court. There is no proof in this record that the rule sought to be imposed as an Oklahoma norm is Oklahoma's common law. It would be improper to give recognition to some local common-law rule in the absence of elicited supporting proof of a statewide custom that has been widely followed by nisi prius judges over a reasonable length of time.

16. Generally, when a newly announced rule of law appears obscure, prospective effect will be given to the pronouncement to protect those who would otherwise suffer from the law's abstruse or obscure contours. *McDaneld v. Lynn Hickey*

Dodge, Inc., 1999 OK 30, ¶ 12, 979 P.2d 252, 257; *Isbell v. State, Etc.*, 1979 OK 156, ¶ 1, 603 P.2d 758, 760–61 (Opala, J., concurring). Prospective application of a decision is not reserved solely for situations that deal with conflicting statutes nor with interpretation of a legislative ambiguity. It is equally commended to those situations where issues of first impression are not clearly foreshadowed by decisional law and where it serves to protect the public's reasonable expectation of reliance on prior judicial decisions. *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, 1986 OK 16, ¶¶ 19–22, 732 P.2d 438, 446–49.

17. Due process is the gauge of fundamental fairness. *McDaneld v. Lynn Hickey Dodge, Inc.*, 1999 OK 30, ¶ 14, 979 P.2d 252; *Shamblin v. Beasley*, 1998 OK 88, ¶ 12, 967 P.2d 1200, 1209; *Joiner v. Brown*, 1996 OK 112, ¶ 6, 925 P.2d 888, 889–890.

18. By statutory definition, a "judgment is the final determination of the rights of the parties in an action" 12 O.S.2001 § 681.

19. The word "merits" has a well-defined meaning in law. What is on or *dehors* the merits depends on whether the issue at hand affects one

 495

claim's dismissal based on the physician's plea in bar—based on her contractual immunity—which is entirely *dehors* the merits. Before a final order could be rendered in favor of the defendant physician, the trial court would have had to decide, **antecedent** to trial, (a) whether the parties had in fact entered into a contract for immunity which the doctor pleaded in bar [20] and, if so, (b) whether that contract will qualify for the trial court's approval. That stage had not occurred here before the dismissal order's entry.

¶ 10 Because there is clearly a factual dispute over whether there had been an offer, acceptance and a meeting of the minds on the terms of the immunity agreement and the trial court had not been urged to consider the norm of common law pronounced today, I would abstain from dealing with that issue but would allow the parties to press it on remand. The physician's contractual immunity and the retrospective application of its judicial approval, if one is given, are both prematurely tendered and dealt with by the court.

## IV

## SUMMARY

¶ 11 Today's adoption of a new legal norm—taken from a single sister state's common-law jurisprudence—shortcuts severely the multiple-stage process of the ALI restatement work. The court's hasty and premature injection of a new Oklahoma norm of unwritten law without any consideration of its impact on existing common law throws to the winds the safeguards built into the ALI restatement system. I would await a careful and thorough ALI examination before adopting the tendered norm into the body of Oklahoma's common law.

¶ 12 Neither can I accede to the retroactive adoption of a new legal norm of Oklahoma's unwritten law whose pre-existence is without record proof and whose effect on freedom of forensic advocacy is likely to be stifling. Moreover, the retroactive application of the new common-law norm clearly violates the due process clause of the Oklahoma Constitution.

¶ 13 I would reverse the dismissal order that falsely parades here as a "summary judgment" but in reality does not qualify either as summary judgment or as any other kind of judgment. I would direct that the trial judge first reach for its resolution on remand—and only upon an evidentiary hearing—the defendant physician's plea in bar based on a contract that confers upon her immunity from suit. If the trial court should conclude that immunity by contract was not conferred on the doctor, the claim could go on to trial of its merits. If the trial court should decide that there was an executed oral agreement by which the plaintiff agreed to release the physician from liability in return for her favorable testimony in a tort case against the hospital, I would afford the plaintiff an opportunity to demonstrate on remand the pre-existence in Oklahoma practice of the common-law norm that requires judicial approval of the agreement for the physician's immunity in this case.

---

or more elements of the claim for relief or those of the defenses that may be interposed against it. *See, e.g., Sommer v. Sommer,* 1997 OK 123, 947 P.2d 512, 522 (Opala, J., dissenting); *Pryse Monument Company v. District Court of Kay County,* 1979 OK 71, 595 P.2d 435, 437–38(when a case is terminated as time-barred, the disposition is "on the merits" because the statute of limitations is an affirmative defense). Neither the title given an instrument by which the issue is tendered nor the stage of the process at which that issue was raised below can conclusively determine whether the question is on or off the merits. *Sommer v.*

*Sommer, supra,* at 522–23 (Opala, J., dissenting); *Roark v. Shelter Mutual Ins. Co.,* 1986 OK 82, 731 P.2d 389, 390 (Opala, J., concurring).

20. Dr. Holter's defense against the tort for which recovery is sought rests on contractual immunity from plaintiff's suit to recover for harm to the minor. For her immunity she promised to and did testify against the Hospital. The factum of the promise's existence is disputed by the plaintiff.